## JOHN O'BRIEN*

*v.*

### THE PEOPLE ex rel. Kellogg Switchboard and Supply Co.

*Opinion filed June 23, 1905—Rehearing denied October 5, 1905.*

· 1. JURISDICTION—*jurisdiction does not depend upon sufficiency of bill.* Jurisdiction of a court of equity does not depend upon the sufficiency of the bill, and if the court has jurisdiction of the parties and of the subject matter the fact that the cause of action is defectively stated does not oust the court of jurisdiction.

2. SAME—*jurisdiction of subject matter does not mean jurisdiction of particular case.* Jurisdiction of the subject matter does not mean jurisdiction of the particular case but of the class of cases to which the particular case belongs, and does not depend upon the sufficiency of the pleadings nor the rightfulness of the decision.

3. SAME—*effect where bill for injunction states conclusions.* A bill for injunction may state conclusions of the pleader, but if not demurred to and the evidence supports a decree conforming to the general allegations of the bill and the decree is within the power of the court the court has jurisdiction, and jurisdiction is not lost because of errors in the decision.

4. INJUNCTION—*what allegations sufficient to give court jurisdiction.* Allegations of a bill for injunction charging defendants with intimidating complainant's employees, assuming a "menacing and threatening" attitude and inducing complainant's employees to leave their employment by "threats and unlawful persuasion," sufficiently charge such acts of the defendants as give the court jurisdiction to pass upon the bill.

---

*With this case are decided No. 3745, *Queenan v. People;* No. 3746, *Fisher v. Same;* No. 3747, *Christensen v. Same;* No. 3748, *Mashek v. Same,* and No. 3749, *O'Brien v. Same.*

5. SAME—*duty to obey injunction does not depend upon correctness of decision.* If the court has jurisdiction of the parties and the bill alleges acts of the defendants sufficient to give the court jurisdiction to determine the sufficiency of the bill, the fact that it may have erred in sustaining the bill and issuing the temporary injunction does not affect the duty of all persons having notice, to obey the injunction until the order is reversed.

6. SAME—*what not a defense to contempt proceeding for violating injunction.* That the terms of an injunction are broader than the allegations of the bill is no defense to a proceeding to punish for contempt in violating the injunction, since the order granting the injunction can be collaterally attacked only by showing it void.

7. SAME—*person having notice is amenable to injunction.* A person having actual notice of the terms of an injunction restraining all undue interference with complainant's employees is amenable to the injunction, even though he was not a party to the injunction suit.

8. CONTEMPT—*an affidavit for attachment for contempt need not be as specific as an indictment.* An affidavit for an attachment for contempt in violating an injunction should show in what respects the injunction was violated, but need not specify the charge with the certainty required in an indictment or bill of particulars.

9. SAME—*when contempt proceeding is civil and not criminal.* A proceeding for contempt in violating an injunction issued to protect complainant's business interests against the unlawful acts of the defendants is of a civil nature, and the defendants are not entitled to be discharged upon their sworn answer, if sufficient, as in case of a contempt proceeding distinctly of a criminal nature.

10. SAME—*party attached for contempt is not entitled to a jury trial.* The act of 1893, (Laws of 1893, p. 96,) providing for a trial by jury where the judgment is to be satisfied by imprisonment, does not apply to a proceeding for contempt where it is sought to coerce the defendant into performance of the duty enjoined upon him by the court.

11. LABOR—*party is entitled to protection in his right to contract.* Every person is entitled to be protected in the right to enter into contracts or in refusing to do so, as he shall deem best for the advancement of his own interests, without interference by others, and any contract executed by a person under circumstances depriving him of his free will in the matter is voidable for duress.

12. SAME—*attempt to compel party to conduct his business by certain class of employees is unlawful.* No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any attempt to compel an individual, firm or corporation to execute an

agreement to conduct his or its business through certain agencies or by a particular class of employees is not only unlawful and actionable, but is an interference with the highest civil right.

13. SAME—*attempt to compel signing of "closed shop" agreement is unlawful.* An attempt to compel an employer to sign an agreement to conduct his business by employing only members of labor unions, under threats of ordering a strike, is unlawful, such an agreement being violative of the legal rights of the employer and unjust and oppressive as to non-union employees.

SCOTT, J., dissenting.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

These several cases come to this court on writ of error to the Appellate Court for the First District.

On May 25, 1903, the Kellogg Switchboard and Supply Company, a corporation organized under the laws of the State of Illinois and engaged in the business of manufacturing and selling telephones, switchboards and electrical supplies, with its principal office in Chicago, filed its bill for an injunction in the superior court of Cook county against certain parties named therein as defendants. The bill alleged that complainant employed from five hundred to eight hundred men and girls in its factory and had invested about $500,000 in machinery, patents, equipments, etc.; that it had in its employ a large number of mechanics who were members of various labor unions with local lodges in Chicago, and it also had a large number of skilled mechanics who were not associated or affiliated with any union; that a large majority of its employees were well satisfied with their wages and salaries paid, the hours of service and the general conditions of their employment, yet notwithstanding such facts the defendants wrongfully and maliciously called a strike and forced all of its employees who were members of the union to cease work; that on May 7, 1903, James J. Lamb, business agent of the International Brotherhood of Electrical Workers, Lee S. Fisher, business agent of the

International Association of Machinists, R. G. Crane, business agent of the Brass Workers' Union, and J. E. Johnson, business agent of the Brass Moulders' Local, called upon the complainant concerning proposed articles of agreement governing the method in which complainant's factory should be operated and insisted that said articles should be signed; that the terms of the proposed articles were arbitrary, unreasonable, and of such a nature as to deprive complainant of the free and unrestricted supervision and conduct of its business and force it to discharge non-union men and girls in its employ; that complainant refused to sign said articles, and on May 7, 1903, a strike was called by said business agents, and the employees, upon leaving complainant's factory, gathered about the streets and alleys around said factory and began to intimidate the employees of said company who insisted upon remaining at work, and instituted and inaugurated what is commonly known as a system of "picketing," and began a systematic course of intimidation, and by threats and personal violence sought to prevent persons from working in said factory. The bill further alleged that these acts of violence and intimidation had continued from the date of said strike until the time of the filing of the bill, and that prior thereto the complainant had entered into numerous contracts for the furnishing of the products of its factory and by these acts of intimidation it had been prevented from operating its factory so as to fulfill its contracts, and as a result had sustained great and irreparable damage, loss and injury, against which it had no relief or remedy except in a court of chancery; that the persons who were made parties defendant to the bill, and others, had entered into a conspiracy to prevent complainant from carrying on its business, and prayed for an injunction restraining said defendants from doing certain things mentioned in said bill.

The bill was supported by numerous affidavits. A preliminary injunction was issued, which restrained the defendants and their confederates from in any manner interfering

with, hindering, obstructing or stopping any of the business of the said Kellogg Switchboard and Supply Company, or its agents, servants or employees, in the operation of the business of such complainant; from entering upon the ground or places where the employees of said complainant are at work, for the purpose of interfering with, hindering or obstructing the business of said complainant in any manner whatsoever; from compelling or attempting to compel, by threats or intimidation, force or violence, any of the employees of said complainant to refuse or fail to do their work or discharge their duties as such employees; from compelling or inducing or attempting to compel or induce, by threats, intimidation, force or violence, any of the employees of said complainant to leave the service of said complainant; from preventing or attempting to prevent any person or persons, by threats, intimidation, force or violence, from freely entering into the service and employ, or continuing in the service and employment, of said complainant; from compelling and inducing or attempting to compel and induce, by threats, intimidation, force, violence or persuasion, the said complainant, against its will or the will of its officers, to employ or discharge any person or persons whomsoever; from doing any act whatever in furtherance of any conspiracy or combination to restrain or obstruct either said complainant or any of its officers and employees in the free, uninterrupted and unhindered control and direction of its business and affairs; from ordering, asking, aiding or abetting, in any manner whatever, any person or persons to commit any or either of the acts aforesaid; from congregating or being upon or about the sidewalks, streets, alleys or approaches adjoining or adjacent to the premises so occupied by said complainant, for the purpose of intimidating its employees or coercing said employees or any of its officers or agents, or preventing them, or any of them, from rendering their services or discharging their duties to said complainant; from inducing or coercing, by threats, intimidation, force, violence

or persuasion, any of the employees of said complainant to leave the service or employment of said complainant; from in any manner interfering with said complainant in carrying on its business in its usual and ordinary way; from in any manner interfering with or molesting any persons who may be employed by or who may be seeking employment with said complainant in the operation of its business; from either singly or in combination with others collecting in or about the approaches to the factory, building and place of business of said complainant for the purpose of picketing or patrolling or guarding the streets, avenues, gates and approaches to the place of business of said complainant, for the purpose of intimidating, threatening or coercing any of its employees or any person or persons seeking employment with it; from interfering with its employees in going to and from their daily work at its place of business, or whatever the said employees may be employed at in the business of said complainant; from going either singly or collectively to the homes of said employees of said complainant, or any or either of them, for the purpose of intimidating, coercing or persuading any or all of said employees to leave the employment or service of the complainant or from entering the employment or service of the complainant, and from intimidating or threatening, in any manner, the wives and families of said employees, at their homes or elsewhere, until the further order of this court. From this interlocutory order an appeal was perfected to the Appellate Court for the First District, where the decree of the superior court was affirmed. *Christensen v. Kellogg Switchboard and Supply Co.* 110 Ill. App. 61.

On June 3, 1903, the complainant filed a petition in the superior court stating, in substance, that immediately after the issuance of the injunction it caused five hundred copies of it to be posted in conspicuous places around its factory buildings, and also caused notices of said injunction to be given as wide a circulation as possible among its employees and ex-employees, and on May 26, 1903, caused a printed

copy of said injunction writ to be mailed to each defendant, and also caused a copy of said writ to be served by a deputy sheriff upon all of the defendants in the neighborhood of its said factory. The petition further stated that persons named therein since the issuing of said injunction had been picketing and patrolling complainant's place of business, stopping persons on their way to take employment with complainant, and had been endeavoring, by threats, intimidation and persuasion, to compel complainant's employees to leave its service and to prevent persons from seeking employment with complainant, and that the persons named therein had congregated on the streets and approaches to the complainant's factory in order to accomplish these purposes. This petition was verified by certain affidavits filed with it.

On June 5, 1903, the complainant filed a supplemental petition substantially the same as the one of June 3, naming other persons who had violated said injunction and who had received personal notice of the existence of the same. This supplemental petition was answered by certain of the defendants named therein, who denied the use of threats, intimidation, coercion or violence towards any persons or in any manner interfering with the workmen going to or leaving the factory, but admitted that since the entry of the injunction order they had during a part of the day stood at Peoria and Congress streets, near complainant's factory, and when they saw any one going to work for complainant requested permission to speak to them, and when granted such permission asked such persons if they knew there was a strike at the factory, and if such persons refused to talk they said nothing further, and that in no case had they used threats or improper language or talked in a threatening or improper manner, but had endeavored only by proper and lawful means and persuasive words to inform and notify persons about to go to work, of the situation at the factory.

At a hearing on the petition and affidavits, on June 15, 1903, the court found that Jacob Christensen, S. E. Doty,

Charles Heinig, Andrew Emerson, Fred Waggoner, Albert Mashek and others were guilty of violating the injunction order, and they were each fined the sum of $10.

On June 22, 1903, the complainant filed another petition, in which it averred that the conspiracy described in its bill had been substantially kept up by the defendants and others co-operating with them; that pickets maintained by defendants had been constantly on the watch in the streets, alleys and approaches to complainant's factory and had intercepted complainant's employees in going to and from their work, and in many cases had succeeded in intimidating and frightening away the said employees and persons seeking employment; that pickets and patrols constantly met the said employees and followed them to their homes, and that by reason of such conduct many of complainant's employees had left its employment; various assaults had been made upon the employees of complainant, and among others who had been guilty of violating the said injunction were John O'Brien, Thomas Queenan, George Christensen, Charles Kreuster, E. R. Frick, F. Dusek, Peter Robinson, A. Emerson, William Lynch and Albert Mashek. Affidavits were filed in support of this petition, and a rule was entered against the defendants to show cause why they should not be punished for contempt of court. Separate answers were filed by some of them, and upon a hearing the court found plaintiffs in error John O'Brien and Thomas Queenan guilty of contempt of court in violating said injunction and imposed a fine of $100 upon each of them.

On July 14, 1903, the complainant filed still another petition, in which it charged Lee S. Fisher, John Brent, Jacob Christensen, Charles Evans, Albert Mashek, John O'Brien, and nineteen others, on numerous occasions with having knowingly and deliberately violated said injunction. Answers were filed by these several defendants, and on July 24, 1903, the court found that George Christensen, Albert Mashek, Lee S. Fisher, John Brent, Charles Evans and

John O'Brien had violated said writ of injunction, and ordered that Lee S. Fisher be fined $100; that George Christensen be committed to the county jail for thirty days; that John O'Brien be committed to the county jail for ten days; that Albert Mashek be committed to the county jail for sixty days; that Charles Evans be fined $25; that John Brent be fined $25, and that R. S. Schoenbacker be discharged. A writ of error was prosecuted to the Appellate Court, where the judgment of the superior court was affirmed, except that the sentence of Mashek was reduced from sixty to thirty days.

The cases were consolidated in the Appellate Court by the agreement of the parties, which agreement is re-entered into in this court.

DARROW & MASTERS, for plaintiffs in error.

TENNEY, COFFEEN, HARDING & WILKERSON, and ALLEN & WESEMANN, (HORACE KENT TENNEY, and JAMES H. WILKERSON, of counsel,) for defendant in error.

Mr. JUSTICE WILKIN delivered the opinion of the court:

The briefs and arguments in the case are exceedingly voluminous on behalf of plaintiffs in error. Thirteen distinct grounds of reversal have been urged, and many of these are subdivided into several heads. It would be impracticable within the reasonable limits of an opinion to even notice all of these points, even if it were profitable to do so. Most of them go to the sufficiency of the original order for the injunction and the petition to punish for contempt for the alleged violation of the writ, the right of trial by jury and of free speech, and of the guilt of the plaintiffs in error. These we will consider as far as we deem it necessary in the proper disposition of the case.

It is insisted that the injunction ordered is void because the bill of complaint states no jurisdictional facts but merely

the conclusions of the pleader. When the bill for injunction was filed the defendants were served with process. They failed to file answers and a writ of injunction was duly ordered to issue. From that order an appeal was prosecuted to the Appellate Court for the First District. (*Christensen* v. *Kellogg Switchboard and Supply Co.* 110 Ill. App. 61.) The Appellate Court, in passing upon the case, held that the court had jurisdiction of the persons of the defendants and of the subject matter of the suit and that the bill was sufficient to sustain the injunction.

The chief argument against the jurisdiction of the court is that the allegations of the bill of complaint are not sufficient to sustain the prayer of the bill and do not set out specific facts which would give the court jurisdiction,—in other words, that the bill would have been obnoxious to a demurrer. It is well settled that jurisdiction does not depend upon the sufficiency of the bill. If the court has jurisdiction of the subject matter and of the parties nothing further is required. The cause of action may be defectively stated, but that does not destroy jurisdiction. A bill may state conclusions, but if not demurred to and the evidence supports a decree conforming to the general allegations of the bill and the decree is within the power of the court to render, the court has jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between the parties to a suit. If the law confers the power to render a judgment or decree, then the court has jurisdiction. (*State of Rhode Island* v. *State of Massachusetts,* 12 Pet. 657; *United States* v. *Anedondo,* 6 id. 709; *Grignon's Lessees* v. *Astor,* 2 How. 338; *Applegate* v. *Lexington Mining Co.* 117 U. S. 267.) Jurisdiction of the particular matter does not mean simple jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which the particular case belongs. (*State ex rel.* v. *Wolover,* 127 Ind. 306; *Jackson* v. *Smith,* 120 id. 520; *Fields* v. *Maloney,* 78 Mo. 172; *Dowdy* v. *Wamble,* 110 id. 280.)

Whether a complaint does or does not state a cause of action is, so far as concerns the question of jurisdiction, of no importance, for if it states a case belonging to a general class over which the authority of the court extends, then jurisdiction attaches and the court has power to decide, whether the pleading is good or bad. (1 Elliott's Gen. Practice, sec. 230; *Hunt* v. *Hunt,* 72 N. Y. 217; *Winningham* v. *Trueblood,* 149 Mo. 572.) Jurisdiction does not depend upon the rightfulness of the decision. It is not lost because of an erroneous decision, however erroneous that decision may be. *Scherer* v. *Superior Court,* 96 Cal. 653; *Young* v. *Lorain,* 11 Ill. 624; *Lane* v. *Bommelman,* 17 id. 95; *Cody* v. *Hough,* 20 id. 43; *Iverson* v. *Loberg,* 26 id. 179; *Feaster* v. *Fleming,* 56 id. 457; *Hobson* v. *Ewan,* 62 id. 146; *Spring* v. *Kane,* 86 id. 580; *Allman* v. *Taylor,* 101 id. 185; *St. Louis and Sandoval Coal Co.* v. *Sandoval Coal Co.* 111 id. 32; *Reid* v. *Morton,* 119 id. 118; *Commercial Nat. Bank* v. *Burch,* 141 id. 519; *State ex rel.* v. *McMahon,* 69 Minn. 265; *People ex rel.* v. *Liscomb,* 60 N. Y. 559.

In this case the bill alleged, as stated by counsel for the relator, that the strikers stationed themselves in the streets and alleys and approaches to complainant's place of business and began to "intimidate" the employees, and began a systematic course of "intimidation," and "warned" the employees not to return to work, and assumed a "menacing and threatening" attitude, and now continue to "menace and threaten" said employees; that the employees were willing to work but were so "frightened and intimidated" that they have refused to continue in the company's employ, and that the strikers have intercepted the employees and have induced them, by "threats and unlawful persuasion," not to enter the company's employ. It is urged that these are conclusions of the pleader, and that, consequently, the bill of complaint is insufficient. But with this contention we do not agree. The allegations sufficiently charge acts of the defendants to give the court jurisdiction to pass upon the sufficiency of the

bill. In such case, whether the court decided correctly or incorrectly could not affect the question of jurisdiction, nor the duty of all persons having notice, to obey the order until reversed by a court of competent jurisdiction. The court having jurisdiction of the general subject matter of the bill, the bill, if defective, could have been amended, and the rule is that judicial proceedings which are amendable are not void. (*Rosenheim* v. *Hartsock,* 90 Mo. 357.) Even if the terms of the injunction are broader than the allegations of the bill, that fact is no defense in a proceeding to punish for a contempt in violating the injunction. *Loven* v. *People,* 158 Ill. 159.

It is also urged that the intent with which an otherwise lawful act is done is not material to characterize the act itself. In a recent case where a malevolent purpose was alleged the Supreme Court of the United States said: "A purely malevolent act may be done even in trade competition." The court also said that in some cases justification "may depend upon the end for which the act is done. * * * It is not sufficient answer to this line of thought that motives are not actionable and that the standards of law are external. That is true in determining what a man is bound to foresee, but not, necessarily, in determining the extent to which he has foreseen." (*Aikens* v. *Wisconsin,* 195 U. S. 194.) In *Swift & Co.* v. *United States,* (Sup. Ct. Reptr. March 1, 1905, p. 276,) the court said: "A general allegation of intent may color and apply to all the specific charges of a bill which seeks relief against the act of July 2, 1890, to protect trade and commerce against unlawful restraints and monopolies." Also: "It is suggested that the several acts charged are lawful and that intent can make no difference. * * * Where acts are not sufficient in themselves to produce a result which the law seeks to prevent,—for instance, the monopoly,—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous proba-

bility that it will happen. (*Commonwealth* v. *Peaslee,* 177 Mass. 267, 272.) But when that intent, and the consequent dangerous probability, exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed whole. * * * The unity of the plan embraces all the parts."

We are, for the reasons stated, of the opinion that the court had jurisdiction of the subject matter and of the parties.

It is a well known rule of law that in proceedings for contempt in failing to obey an order of court the respondent may question the order which he is charged with refusing to obey only in so far as he can show it to be absolutely void, and cannot be heard to say that it is merely erroneous, however .flagrant it may appear to be. The judgments of courts cannot be.attacked collaterally for mere irregularities. (*Clark* v. *Burke,* 163 Ill. 334; *Leopold* v. *People,* 140 id. 552.) Therefore plaintiffs in error cannot question in this proceeding the sufficiency of the bill upon which the writ of injunction was granted.

Immediately after the writ of injunction was issued the Kellogg company had five hundred copies of it posted in the immediate vicinity of its works. It also had copies served upon some of defendants personally, by the sheriff, and sent copies to others through the mail. The fact that some of the plaintiffs in error were not parties to the injunction suit and were not served with process, and had no notice of the application for the injunction or were not served by the officer of the court with such injunction, is immaterial, so long as it is made to appear that they had actual notice of the contents of the injunction ordered and issued by the court. "To render a person amenable to an injunction it is not necessary that they should have been a party to the suit, so long as they had actual notice of the contents of such injunction." (High on Injunction, sec. 1444.) With the exception of Fisher and Brent it is admitted that all of the other plaintiffs

in error knew of the injunction, and in view of the prominent part which they both took in the matter, it is unreasonable to suppose that they (Fisher and Brent) did not have knowledge of its existence. If they did not it was their duty to properly present that fact to the trial court upon the hearing, which they failed to do.

It is next insisted that the petition and affidavits upon which the attachment for contempt was based were not sufficient, for the reason that they did not clearly and specifically inform plaintiffs in error as to the offense with which they were charged. We do not think this position tenable. Courts of chancery have within themselves full power and authority to enforce their official mandates in a summary and effective manner. To say otherwise would render them powerless and inefficient. When the original bill for injunction was filed certain persons were made parties defendant and were duly served with process. As we have said, the court had jurisdiction of the persons and the subject matter of the suit and issued the injunction, which was not only binding upon the persons who were actual parties defendant to the bill, but was also binding upon all persons who had actual notice of the contents of the writ, and the decree granting the injunction could only be attacked in a collateral proceeding upon the ground that it was absolutely void. We think all the plaintiffs in error are chargeable with actual notice of the writ and its contents, and are therefore liable for contempt if they violated it. Various petitions were filed in the superior court to the effect that the terms of the writ of injunction had been violated by parties therein named. Many affidavits were filed in support of these petitions, and the affidavits and petitions, together with the writ of injunction, notified these parties of the specific respects in which it was claimed the order of court had been violated, namely, by picketing, patrolling, persuading, threatening and assaulting. We are unable to see how it can be successfully maintained that defendants below did not have sufficient notice

of the charge made against them to intelligently prepare their defense, if they had any. They were not entitled to a specific bill of particulars, nor was it necessary to set out the charge with the same particularity that would be required in an indictment. (1 Bishop on Crim. Proc. sec. 643.) It has often been held that in an attachment proceeding for contempt, alleged to have been committed out of the presence of the court, it should be brought to the attention of the court by an affidavit setting out the particular respects in which the injunction is alleged to have been violated, but that was sufficiently done in this case. 4 Ency. of Pl. & Pr. 776, 780; *People* v. *Diedrich,* 141 Ill. 665; *Oster* v. *People,* 192 id. 473.

It is again insisted with much earnestness that this proceeding is criminal in its nature, and therefore the defendants below were entitled to be discharged upon their sworn answer, and if their answer was not sufficient they could only be punished after they had been tried and convicted by jury. Proceedings for contempt of court are of two classes: those which are criminal in their nature and those which are designated as purely civil remedies. When the contempt consists of something done or omitted in the presence of the court tending to impede or interrupt its proceedings or lessen its dignity, or out of its presence in disregard or abuse of its process, the proceeding is punitive or criminal, and the penalty is inflicted by way of punishment for the wrongful act and to vindicate the authority and dignity of the people, as represented by their judicial tribunals. In such cases the application for attachment may be made in the original cause, yet the contempt proceeding will be a distinct case criminal in its nature. Cases of this kind are clearly distinguished from cases where the parties to a civil suit, having the right to demand that the other party do some act for their benefit, obtain an order from a proper court commanding the act to be done, and upon refusal the court, by way of executing its orders, proceeds as for contempt, for the purpose of advancing the civil remedy of the other party to the suit. In this

class of cases, while the authority of the court will be incidentally vindicated, its power has been called into exercise for the benefit of a private litigant and not in the public interest, merely. If imprisonment is ordered, it is not as a punishment, but to the end that the other party to the suit may obtain a remedy for the advancement of his own private interest and rights which he could not otherwise maintain. (*Loven* v. *People,* 158 Ill. 159; *Crook* v. *People,* 16 id. 534; *People* v. *Diedrich,* 141 id. 665; *Lester* v. *People,* 150 id. 408; *Leopold* v. *People,* 140 id. 552.) The bill for the writ of injunction which the defendants are charged with having violated alleged that the complainant had vast interests at stake in the business enterprise in which it was engaged, and that the defendants had conspired together unlawfully to injure that business. Upon this bill being filed a writ of injunction was ordered for the purpose of protecting the company against the unlawful acts of certain persons, and when the injunction was issued and the plaintiffs in error were attached for contempt of court it was primarily because they were injuring the business of the Kellogg company, and the punishment was inflicted to prevent such injury. While it is true that the dignity of the law and the order of the judicial tribunal have been violated, this was merely incidental to the rights of private individuals. The proceeding for the attachment was civil, and in no sense criminal. The rule is, that when the defendant is attached for contempt of court for a criminal offense and files a sworn answer, that answer, if sufficient to purge him of the alleged contempt, may be taken as true and the defendant discharged. But this rule applies only where the proceeding is brought to vindicate the law or the dignity of the court, and does not apply to acts treated as contempts, for the enforcement of orders and decrees as a part of the remedy sought to be enforced. (*Loven* v. *People,* 158 Ill. 159.) In the case at bar plaintiffs in error filed their sworn answer to the petition for attachment for contempt, and as these proceedings were not purely criminal

216-24

in their nature, the answers filed did not entitle them to be discharged, and the chancellor did not err in so holding.

It is, however, contended, that even though they were not entitled to be discharged upon their sworn answers, they still had the constitutional right to a trial by jury, and could not be legally deprived of their liberty or property without such a trial. Upon the filing of the petitions for contempt and the appearance of the defendants thereto, the court proceeded in the summary to hear the case upon the petitions, answers and affidavits filed by the respective parties. In 1893 the legislature of this State passed an act providing for a trial by jury in all cases where a judgment was to be satisfied by imprisonment. (Laws of 1893, p. 96.) In the case of *Barclay* v. *Barclay,* 184 Ill. 471, we decided that this act did not apply to the case of proceedings for contempt of court, where it was sought to coerce defendant into the performance of the duty which the court had ordered him to perform. (See, also, *People* v. *Kipley,* 171 Ill. 44; *United States* v. *Debs,* 158 U. S. 564.) These authorities are decisive of the question here raised, and hold that the defendants in such a proceeding as this are not entitled to a trial by jury.

It is insisted and argued at great length that the alleged acts of plaintiffs in error were not in violation of the injunction and that they were not shown to be guilty of those acts. The determination of these questions involves a consideration of the facts and circumstances under which the alleged strike was ordered and the purpose which was sought to be accomplished by it.

The Kellogg company employed from five to eight hundred men and women, some belonging to labor unions while others did not. On May 7, 1903, several of the leaders of labor unions called upon the company and submitted a certain agreement which they sought to have it sign. Among the conditions in that agreement are the following:

"Art. 2. Party of the first part hereby agrees to employ none but members of the aforesaid organizations or those

who carry the regular working card of the said organization, provided the various crafts will furnish such competent help as may be required by the party of the first part within twenty-four hours after notification.

"Art. 7. There shall be a steward for each craft in each factory bound by the organization, whose duty it shall be to see that the men working in said factory belong to the organizations.

"Art. 8. It is hereby agreed by the party of the first part that the business agent of the party of the second part shall have the privilege of interviewing any member of the party of the second part in the offices of the party of the first part during business hours.

"Art. 10. A sympathetic strike to protect union principles shall not be considered a violation of this agreement.

"Art. 11. All the apprentices shall belong to the union and carry the working card of the organization.

"Art. 12. The number of apprentices shall not exceed one for every ten men or less of the different crafts."

The Kellogg company refused to sign the agreement, and was informed by the business agents of the unions that a strike would be called if the agreement was not signed. In other words, these business agents sought to obtain the signing of the contract by threats, or to induce the company to sign it in order to avoid a strike. A contract executed under duress is voidable, and duress is present where a party is constrained under circumstances which deprive him of the exercise of free will to agree to or to perform the act sought to be avoided. (10 Am. & Eng. Ency. of Law,—2d ed.—p. 321.) The law is well settled that every person shall be protected in the right to enter into contracts or in refusing to do so, as he shall deem best for the advancement of his own interests, without interference by others. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any attempt to compel an individual,

firm or corporation to execute an agreement to conduct his or its business through certain agencies or by a particular class of employees is not only unlawful and actionable, but is an interference with the exercise of the highest civil right. Thus we said in *Doremus* v. *Hennessey*, 176 Ill. 608, on page 614: "The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which cause another loss in the enjoyment of any right or privilege of property. No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require. * * * It is clear that it is unlawful and actionable for one man from unlawful motives to interfere with another's trade by fraud, misrepresentation, or by molesting his customers, or those who would be customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation, or physical or moral intimidation or persuasion, with an intent to inflict an injury which causes loss. * * * Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong. Damage inflicted by fraud or misrepresentation, or by the use of intimidation, obstruction or molestation, with malicious motives, is without excuse, and actionable. Competition in trade, business or occupation, though resulting in loss, will not be restricted or discouraged, whether concerning property or personal services. Lawful competition that may injure the business of another, even though successfully directed to driving that other out of busi-

ness, is not actionable. Nor would competition of one, set of
men against another set carried on for the purpose of gain,
even to the extent of intending to drive from business that
other set and actually accomplishing that result, be actionable
unless there was actual malice. Malice, as here used, does
not merely mean intent to harm, but means an intent to do
a wrongful harm and injury. An intent to do a wrongful
harm and injury is unlawful, and if a wrongful act is done
to the detriment of the right of another it is malicious, and
an act maliciously done with the intent and purpose of in-
juring another is not lawful competition. In this case it is
clear the evidence sustained the allegations of the plaintiff's
declaration, and there is here no contention on the facts.
The principles herein announced are sustained by the weight
of authority in England and in this country.—*Lumley* v.
*Gye,* 2 E. & B. 216; *Blake* v. *Lanyon,* 6 T. R. 22; *Sykes* v.
*Dixon,* 9 A. & E. 693; *Pilkington* v. *Scott,* 15 M. & W.
657; *Hartley* v. *Cummings,* 5 Com. B. 247; *Bowen* v. *Hall,*
L. R. 6 Q. B. Div. 333; *Carew* v. *Rutherford,* 106 Mass. 1;
*Walker* v. *Crowen,* 107 id. 555; *Chipley* v. *Atkinson,* 1 So.
Rep. 934; *Delz* v. *Winfree,* 165 W. Rep. 111; *Curran* v.
*Galen,* 22 N. Y. Supp. 826; *VanHorn* v. *VanHorn,* 52
N. J. L. 284." See also *Aikens* v. *Wisconsin,* 195 U. S. 194.

Under the foregoing authorities there can be no doubt
that any attempt to coerce the Kellogg Switchboard and
Supply Company into signing said agreement by threats to
order a strike was unlawful. It was violative of the clear
legal right of the company, and was unjust and oppressive
as to those who did not belong to the labor organizations.
Nevertheless the strike was ordered, and thereafter plaintiffs
in error sought by threats, intimidation and violence to pre-
vent men and women from taking the places of the strikers.

In the case of *Mathews* v. *People,* 202 Ill. 389, in consid-
ering the Free Employment act, we said (p. 401): "An
employer whose workmen have left him and gone upon a
strike, particularly when they have done so without any jus-

tifiable cause, is entitled to contract with other laborers or workmen to fill the places of those who have left him. Any workman seeking work has a right to make a contract with such an employer to work for him in the place of any one of the men who have left him to go out upon a strike. Therefore the prohibition contained in section 8 strikes at the right of contract, both on the part of the laborer and of the employer. It is now well settled that the privilege of contracting is both a liberty and a property right. Liberty includes the right to make and enforce contracts, because the right to make and enforce contracts is included in the right to acquire property. Labor is property. To deprive the laborer and the employer of this right to contract with one another is to violate section 2 of article 2 of the constitution of Illinois, which provides that 'no person shall be deprived of life, liberty or property without due process of law.' It is equally a violation of the fifth and fourteenth amendments of the constitution of the United States, which provide that no person shall be deprived of life, liberty or property without due process of law, and that no State shall deprive any person of life, liberty or property without due process of law, 'nor deny to any person within its jurisdiction the equal protection of the laws.' (*Ritchie* v. *People,* 155 Ill. 98; *Adams* v. *Brenan,* 177 id. 194; *Gillespie* v. *People,* 188 id. 176; *Fiske* v. *People,* id. 206.) The provision embodied in section 8 'is a discrimination between different classes of citizens founded on no justifiable ground, and an attempt to exercise legislative power in behalf of certain classes and against other classes, whether laborers seeking work or employers. It falls under the condemnation of the constitution.' "

Between the time the strike was called in this instance and the date of the application for an injunction it appears from the evidence that acts of lawlessness were committed, and plaintiffs in error attempted to compel the Kellogg company to sign the foregoing labor contract and to prevent other laborers from taking the places of the strikers until it

did so.  The injunction was issued by the court restraining these various unlawful acts, but after the writ was issued and served as far as it could be there was no change in the conduct of plaintiffs in error, and the several petitions were filed in the superior court charging the violation of the writ.  In support of such petitions more than one hundred affidavits were filed.  A general review of the evidence disclosed by these affidavits is wholly impracticable.  Some of plaintiffs in error are expressly mentioned in a part of the affidavits, to which reference should be made.

In support of the petition of June 22 it was alleged in one of the affidavits that Thomas Queenan, at the east door of the factory, spoke to one Hall and tried to persuade him to quit working for complainant, and said to him, "Do you know that they have got to come to terms with us?" and Hall answered, "No; I don't know that," when Queenan replied, "Well, you should know."

An employee of complainant was stopped by plaintiff in error John O'Brien as the former was going to his lunch at the noon hour.  O'Brien said to him, "You boys ought to stay out and join the union; you want to try and get the other fellows out and join the union also."  When the employee said he was satisfied with his work and did not want to quit, O'Brien responded, "If you don't come out to-night I will lick you."

The affidavits in support of the petition of July 14 show that on divers days between June 22 and July 14 plaintiffs in error Fisher, Christensen, Evans, Mashek and Brent picketed and patrolled around and about complainant's place of business, watching the streets, alleys and approaches thereto, daily shifting their positions; that they stationed themselves where the laborers employed in the factory were obliged to pass through the picket lines, and their attitude was ugly and menacing and such as to cause fear in the mind of an ordinary person, and that John O'Brien picketed and patrolled in a similar way.  O'Brien in his answer states that

he was fined July 2, 1903, which was under the rule to show cause entered on the petition filed June 22. He said in his answer that since July 2 he had not in any way participated in the strike, thereby admitting, by inference, that prior to that time he had taken part in the same.

In addition to the specific instances mentioned, the evidence abundantly shows that employees of the Kellogg company, and persons seeking employment there, were waylaid on their way to and from the factory, insulted, threatened, and in many instances assaulted and beaten, by strikers, pickets and patrollers, and that on June 30, 1903, when a number of men and girls were being escorted from the factory to their homes they were met by a crowd of men and boys, bringing on a serious riot. The employees were hissed, called "scabs," bricks and stones were thrown at some of them, and more or less shooting occurred. Large numbers of the strikers surrounded the plant, in company with at least a part of plaintiffs in error, and sought by every means in their power to embarrass and hinder the company in the peaceable pursuit of its business. The evidence, considered as a whole, is convincing that each of the plaintiffs in error was actively engaged in one or more of these unlawful acts, or aided, abetted, advised, assisted or encouraged others to commit them. That the acts were unlawful and in disregard of the expressed commands of the injunction cannot be denied.

The importance and far-reaching consequences of the cases are fully appreciated. We have endeavored to give the material questions raised and discussed in the argument due consideration, and have reached the conclusion that the judgments of the superior court were properly affirmed by the Appellate Court. The judgment of the latter court will accordingly be affirmed.          *Judgment affirmed.*

Mr. JUSTICE SCOTT, dissenting.