Fansteel Metallurgical Corporation, Appellee, v. Lodge
66 of the Amalgamated Association of Iron, Steel
and Tin Workers of North America et al., Appellants.

Gen. No. 9,257.

324

Opinion filed May 10, 1938.

LESTER F. COLLINS, of Waukegan, and GILLESPIE, BURKE & GILLESPIE, of Springfield, for appellants.

LEVINSON, BECKER, PEEBLES & SWIREN, of Chicago, and SIDNEY H. BLOCK, of Waukegan, for appellee; MAX SWIREN and HAROLD M. KEELE, both of Chicago, and SIDNEY H. BLOCK, of counsel.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

This is an appeal by Meyer Adelman, Oakley Mills and thirty-seven other defendants from a decree which

found appellants guilty of contempt of court for violating a preliminary injunction which had been issued by the circuit court of Lake county on February 18, 1937.

The record discloses that the Fansteel Metallurgical Corporation is incorporated under the laws of the State of New York, that its properties consist of seven and one-half acres of ground located in North Chicago, upon which are fifteen buildings which house its machinery, equipment and inventories. It is engaged in the extraction of rare metals from ores and intermediate products, making tungsten, tantalum, molybdenum, rubidium, calsium and a line of battery chargers, rectifiers, transformers and carbide tools. On February 17, 1937, this company had three hundred and eighty persons in its employ in its plant. The appellants except Adelman and Mills were employees. Adelman and Mills were not employed by the Fansteel Corporation but were field directors for the steel workers' organizing committee of the Amalgamated Association of Iron, Steel and Tin Workers of North America. Their work as members of this organizing committee was to assist unorganized workers to organize themselves into labor unions and, so acting, an organization was formed among the employees of appellee designated as "Lodge 66 of the Amalgamated Association of Iron, Steel and Tin Workers of North America." On February 17, 1937, a committee from this Lodge held two conferences with the management of appellee and were advised by the factory superintendent that the policy of appellee was not to recognize the union which the committee represented. Thereupon the committee voted to cease work and to evidence their protest by striking and remaining in the buildings of the appellee where they were employed. About 2:30 o'clock on the afternoon of this day some ninety of the employees of appellee, who were in two of appellee's buildings, designated in the record as buildings three and five,

stopped work, evicted their foremen and remained in possession of these two buildings, locked, wired and barricaded the doors from the inside, refused to admit the officers and plant superintendents of appellee and continued to hold possession of these buildings by force for the ensuing 8 days. During the evening of February 17, 1937, representatives of appellee made a formal demand to be permitted to enter the buildings but their demand was refused by those inside, whereupon they were, by appellee's representatives, informed that those employees who were within the buildings were discharged. Written notices were also passed into the buildings notifying those in the buildings that appellee, upon the following morning, would file its complaint in the circuit court of Lake county and at that time would apply for a preliminary injunction restraining those in possession of appellee's property from continuing in their illegal occupancy thereof.

On February 18, 1937, the complaint in the instant cause was filed. It was verified by the president of appellee, its plant superintendent and its several department foremen. The complaint made Lodge 66 of the Amalgamated Association of Iron, Steel and Tin Workers of North America, the Steel Workers Organizing Committee of the Committee for Industrial Organization and some thirty-five individual defendants. All of the defendants entered their respective appearances by their attorneys and upon a hearing had, an order was entered, finding that the seizure of the buildings of appellee was illegal and that their occupancy constituted a continued trespass and the court issued a preliminary injunction directing the men who were occupying the buildings to vacate the same and restore possession thereof to appellee. The sheriff went to the plant to serve and execute this writ. Both buildings were locked and the men within refused to admit the sheriff. Some of those within however came to the

open windows and the sheriff read the writ and explained its meaning and passed into the buildings at least eighty copies of the writ and posted additional copies around the plant. The sheriff asked for the name of those who would accept service of the writ and appellant Swanson in one building said he would and either Swanson or some of the others inside the building advised the Sheriff that Swanson was their leader. Appellant Warner apparently was the leader in the other building and is spoken of in the record as captain. The sheriff returned the writ stating in his return that it was duly served upon the defendants by reading the same to them and leaving about twenty-five copies thereof upon the premises occupied by the defendants; that he posted at least two copies of the writ on each building occupied by the defendants and left a copy thereof with Carl Swanson, Harold Dreyer and Frank Lutz. The following day appellee filed its verified petition reciting the foregoing and prayed for an attachment and rule to show cause. Upon a hearing the court ordered a writ of attachment to issue and directed the sheriff to bring the bodies of the men in possession of the premises of appellee before the court and a rule was entered upon them to show cause why they should not be held in contempt of court. Thereupon the sheriff and his deputies, with the writ of attachment, went to the buildings occupied by the employees but were unable to gain admission. The officers advised the men that they had a warrant for their arrest and requested that they come out of the buildings. They refused. The officers, numbering fifty, tried to effect a forcible entrance but in building number five streams of water from a hose were poured upon them, and in both buildings windows were broken, wire spools, bolts, drills and iron missiles of all kinds and sulphuric acid were thrown and poured upon the officers. One of the deputies was quite severe-

ly burned and several injured. On February 26, 1937, by the use of tear gas, the officers were finally successful in forcibly evicting those in possession of the building.

On February 26, 1937, appellee filed its supplemental complaint and petition, which alleged the foregoing and charged that appellants, other than Adelman and Mills, had wilfully violated the previous orders of the court and had resisted with violence the efforts of the officers to enforce those orders and charged Adelman and Mills with having aided, assisted and facilitated the other appellants in unlawfully violating the orders of the court. A change of venue was taken from the chancellor who issued the preliminary injunction and after all of the defendants had answered, a hearing was had. The court found twenty-four of the appellants guilty and imposed a fine of $100 upon each and committed each to the county jail for a period of 10 days. The court also found eleven of the appellants guilty and imposed a fine of $150 upon each and committed each to jail for 120 days. The court found the appellants Warner and Swanson guilty and imposed a fine upon each of $300 and committed each to jail for 180 days. Appellant Mills was found guilty and fined $500 and committed to jail for 180 days and appellant Adelman was found guilty and fined $1,000 and committed to jail for 240 days.

It is first insisted by counsel for appellants that the evidence discloses that this sit-down strike arose because of the refusal of appellee to bargain collectively with the representatives of its employees, that by so doing appellee violated the express provisions of the National Labor Relations Act which vested exclusive jurisdiction of all labor disputes affecting interstate commerce in the labor board created by that Act, that the circuit court of Lake county was therefore without jurisdiction to issue the preliminary injunction which

forms the basis of this proceeding and being without jurisdiction, the order which it issued was void and being void, the chancellor was without authority to punish for any disobedience thereof.

Counsel for appellants argue that the National Labor Relations Act designated as the Wagner Act, 29 U. S. C. A. secs. 151–166, is a complete code covering all the relations of employer and employee, that in enacting it congress considered all phases of the relations between employer and employee and prescribed the powers and duties of each so far as it seemed advisable to provide for their regulation. That no State court can have any jurisdiction of any subject matter arising thereunder and the circuit court of Lake county was wholly without jurisdiction either to issue the preliminary injunction or impose the penalties upon appellants for a violation thereof. Counsel for appellee concede the plenary power of congress over interstate commerce but point out that the Supreme Court has recognized the propriety of supplementing specific federal regulation of interstate commerce with reasonable State police regulations so long as they do not conflict and cites *Dickson* v. *Uhlmann Grain Co.,* 288 U. S. 188, 53 Sup. Ct. 362, 83 A. L. R. 492. In that case a broker sought to recover on a grain margin account. The defense relied upon a Missouri statute which provided that such transactions were gambling and therefore illegal. The plaintiff contended that the transactions were valid because carried on in compliance with the Federal Grain Futures Act, 7 U. S. C. A. secs. 1–17. The question presented for determination was whether the Federal Grain Futures Act which regulated the entire subject of dealings in futures on contract markets superseded and nullified the prohibition of any such transactions by the Missouri statute. The Supreme Court held that although the act of congress required those participating in interstate futures transactions to comply with specific regulations, the

State of Missouri retained the power to declare legal participation within Missouri in such interstate transactions.

In *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 108 A. L. R. 1352; the Supreme Court having the Wagner Act under consideration stated that: "the Statute goes no further than to safeguard the right of employees to self organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer." As counsel for appellee points out, the provisions of the act guarantee the right of self organization and collective bargaining to employees in interstate commerce and the National Labor Relations Board has authority and jurisdiction to enforce those rights. The act enacted in the hope that it would reduce industrial conflicts but no power to preserve order or prevent violence incident to labor disputes is conferred upon the board nor is there anything in the act which could be construed to mean that congress intended to interfere with the States in providing police protection to its citizens or their property. To give the act the construction contended for by appellants would very likely render the act itself invalid. Certainly a court of equity is not deprived of a recognized branch of its jurisdiction simply because the Federal Act creates a board which has no power to hear complaints or grant relief of the character which the State court granted here. Because an employer refuses to bargain with its employees collectively cannot justify those employees in their conduct of a strike in seizing the factory of their employer and without authority of any kind evict their foreman, barricade the doors, deny the rightful owner admission to his own property, and defy those whom they know to be officers charged by law to carry out the orders and decrees of a court.

In *Missouri Pac. R. Co. v. Norwood*, 283 U. S. 249, 75 L. Ed. 1010, two statutes of the State of Arkansas

regulating the number of brakemen and helpers required on freight trains and switching crews were sustained by the Supreme Court and in doing so the Court stated that the provisions of the Railway Labor Act of 1926, 45 U. S. C. A. sec. 151 *et seq.,* in no way conflicted with State laws and that in the regulation of the number of men to be employed in such switching crews, congress, in the absence of a clearly expressed purpose so to do, will not be held to have intended to prevent the exertion of the police powers of the States.

There is nothing in the Wagner Act which deals with the subject of violence or any illegal acts committed by employees in the course of an industrial dispute and in our opinion congress did not, by its enactment of the Wagner Act, deprive or attempt to deprive the States of their police power to protect property rights or punish illegal acts committed in the course of labor disputes nor do we think that there is any merit in the contention of appellants' counsel when they insist that equity cannot now have jurisdiction of any phase of the subject of the relations between employer and employee in a labor controversy affecting interstate commerce. The remedies available to either an employer or employee in a court of equity prior to the enactment of this act are still available and let us hope will continue to be. We might add that the question of the jurisdiction of the circuit court to issue this injunction was raised by appellants' counsel for the first time in this court. The record discloses that the question was not presented to the chancellor at any time by any motion, pleading or argument. It is evidently an afterthought.

It is next insisted that the evidence found in the record is not sufficient to support the finding and judgment against appellants Adelman and Mills. It will be recalled that Adelman and Mills were not employees of appellant. They were not named as defendants in the original complaint but by the supplemental complaint it was charged that they were the directing heads of

Lodge 66 of the Amalgamated Association of Iron, Steel and Tin Workers of America and that they were cooperating with the steel workers' organizing committee of the C. I. O., that they encouraged, aided, abetted and facilitated those who were in the actual unlawful possession of appellee's property to retain the same in disregard of the writ of injunction of which they had notice. The supplemental complaint charged that such aiding and abetting was achieved by furnishing food and supplies to those employees who were in possession of appellee's property in order that they might continue to occupy the same, that they exhorted by speeches and notes the men so occupying appellee's property to retain possession thereof and to resist by violence the officials of the court in their efforts to enforce the preliminary injunction. The evidence is that Adelman was a field worker for the steel workers' organizing committee of the Amalgamated Association of Iron, Steel and Tin Workers of North America. He counseled and advised Lodge 66 and its members from its inception. Mills was his assistant. Adelman was present in court when the preliminary injunction was issued by the court. He knew its provisions and that the court had found the men in appellee's buildings were not lawfully there and that the court had ordered them to vacate. Adelman was personally present on the outside of the buildings practically every day from February 18th to February 26th and the overwhelming weight of the evidence is that on several occasions during the time he conversed with Warner and others in building No. 5 and with Swanson and others in building No. 3 and inquired whether they were comfortable and had plenty to eat, stated that the public and several unions were back of the men, that they should continue to hold the fort, to give no ground, to take no instructions from anyone except himself and Rasmussen, that they should keep their guards well posted to

the rear of the buildings, that he was with them 100 per cent, that everything would turn out all right, that they would win and promised the men that he would see to it that they would have plenty of bedding, supplies and provisions sent in to them. The evidence is further that he made a number of speeches and sang a picket line song once during the period the men were in the buildings, addressing those who had gathered on the outside and so that those who were on the inside could hear, in which he urged the men to continue to occupy the premises, to stick to the strike, to hold the fort and repeated much which he had told Warner, Swanson and the others in his conversation with them. All this is testified to not only by some of the officers but by others who were present, some of whom were in the buildings at the time. Such in substance is the testimony of Fred Karpinski, Louis Bereczky, Arthur Sladek, Milton Sladek, Chester Hook, Alf Sunorison, Frank Osenek, John Germer, Edward Zersen, Donald Dwyer, Frank Valenti and others.

The evidence is further that while the unlawful occupancy of appellee's premises was in progress, large crowds of relatives, sympathizers and friends of the men who were in the buildings gathered on the outside, during the day and also at nights, estimated by one witness from six to one hundred and upon one occasion as many as one thousand. Packages of food and clothing were sent into the buildings by means of ropes let down from windows. Those packages were inspected by the officers in order that no firearms or weapons might get to the men. Oakley Mills came to Waukegan in December, 1936, and assisted Adelman in his organizing work. He knew of the issuance of the injunction and testified that between February 17th and February 26th he was at the plant at least once, every day, and also at night, that he talked to the men in the buildings, supplied them with between 50 and 60 dol-

lars' worth of food which he himself purchased and hoisted into the buildings. According to the weight of the testimony he was abusive and discourteous in his remarks to the officers, indulged in the most violent, obscene and indecent language toward them, invited them to come and fight him, stating that he came from the West Virginia coal mining regions where they had real strikes. The evidence is also that he, Mills, talked to Warner and Swanson and the other men in the buildings and advised them to hold their fort at all costs, that there was plenty of help outside and that they would win.

No one can read this record without coming to the conclusion that Adelman and Mills affirmatively and effectively and materially aided and abetted in the continued violation of the preliminary injunction which they knew had been issued. As counsel for appellee state, they provided the seasoned leadership, encouragement and quantities of supplies and provisions which made it possible for those in the buildings to remain there for 10 days. The force and violence used by others during this period of time would probably never have occurred except for the counsel and leadership of Adelman and Mills. Their language and conduct discloses that they had no respect for judicial process or for the officers of the court charged with the responsibility of enforcing its orders. Language or conduct intended to incite others to a violation of a court's order is a contempt of court and the use of language which has for its natural effect the inciting of others to do violence in disregard of the orders of a court is a contemptuous act. *Stewart v. United States,* 236 Fed. 838, cited with approval in *O'Brien v. International Ladies Garment Workers Union,* 214 Ill. App. 57. In *Sloan v. People,* 115 Ill. App. 84, the court quoted with approval from *Seaward v. Paterson,* 66 L. J. (N. S.) 267, which held that a person who know-

ingly aids and assists in the doing of acts which had been expressly prohibited by injunction, although he is not a party to the litigation nor named in the order granting the injunction may be committed for contempt, that while such a person is not bound by the injunction any more than anybody else, such person is bound like anybody else not to interfere with or obstruct the course of justice.

It is finally insisted that the punishment inflicted upon each of the appellants is oppressive and disproportionate to the offense committed. Counsel state that this cause was prosecuted before the chancellor upon the theory that those appellants who had been employees of appellee were trespassers and invaders of appellee's property and that these appellants were animated only by malevolent purposes against their employer and by a desire upon their part to flout the courts and the law, that Adelman and Mills were severely sentenced because they were engaged in organization activities obnoxious to the social and economic views of the chancellor who imposed the sentences and that the chancellor seemed to be unable to distinguish between one acting in good faith and under claim of right, even though ill-advised and one acting from malicious motives and evil intent.

Whether appellants acted in good faith or whether their conduct was malicious and intentionally contemptuous can only be determined from what this record discloses was said and done by appellants. Upon the hearing their counsel stated that they did not deny that the provisions of the preliminary injunction were violated to a certain extent and that what was done was done knowingly but what they did contend was that appellants did not act maliciously or with the intent to bring the court into disrespect. We do not think this contention is warranted by the record. The seizure and detention of appellee's property was

illegal. *Apex Hosiery Co. v. Leader,* 90 Fed. (2d) 155. Charles Warner, one of the appellants, testified that he did not talk to the sheriff or his deputies when they came on February 18th to serve the injunction writ but that the officers evidently handed a copy of the writ through the window as he, Warner, was furnished with a copy by someone, that he had a high school education, was an army officer in the World War, and attended an officers' training school in Europe, that he did not read it, but it was passed around among the men through the plant, that the men talked it over, discussed the contents of the writ, knew it ordered them out of the building but decided they would remain in the building. That when the men discussed the matter they decided that appellee was violating the provisions of the Wagner Act and concluded that the State courts had no right to issue an injunction and that therefore they were justified in remaining in the building. Frank Osenek testified that he was in building No. 5, at the time the writ was read by the sheriff or his deputy, that the men read it downstairs and that then Warner read it on the second floor, that he read it aloud to at least ten men and that when he had finished reading it, he, Warner, said: "We don't want to listen to anything like that—to hell with them." We have heretofore referred to Adelman and Oakley and to their conduct and language. Chicago and Waukegan newspapers containing articles with reference to the Fansteel strike and commenting upon the fact that the court had issued an injunction and had ordered the men in the buildings to evacuate the same were delivered to the men in the plants twice each day and the evidence is that the men in the plants read these articles. The preliminary injunction was granted upon notice and appellants were present in open court at the time the injunction was ordered or were represented by counsel. The writ was served by the sheriff.

The only reasonable conclusion that can be drawn from all the evidence found in this record is that each appellant knew that the local court had ordered those in possession of appellee's property to restore that property to its owner, and had issued an appropriate order to that effect. Appellants knew also that the law enforcing officers of their county, acting under lawful process, were endeavoring to carry out the orders of the court. Their only excuse for not complying with those orders was that they questioned the right of the court to issue the injunction. In this they were mistaken. It is the law of this State that if the circuit court had jurisdiction of the parties and the subject matter, then any order made in the exercise of that jurisdiction must be obeyed until it is reversed or set aside. *O'Brien v. People*, 216 Ill. 354, 75 N. E. 108. It is conceded that the court acquired jurisdiction of the persons of appellants and we hold that it had jurisdiction of the subject matter. The propriety of the orders issued by the circuit court is not before us for review. This is only an appeal from the order of the chancellor finding appellants guilty of contempt. There is in our opinion no substantial defense interposed on behalf of any of appellants and there can be no doubt as to the propriety of the court in finding appellants guilty. Finding, as we do, that the court had jurisdiction to enter the order granting a preliminary injunction, it also had the power to lawfully enforce obedience thereto and the power to enforce includes the power to impose penalties as a punishment for the defiance of its orders either by fines or by jail sentences or both.

In *Hake v. People*, 230 Ill. 174, 82 N. E. 561, 568, the court stated: ''The law is well settled that a court of chancery may impose a fine alone for the violation of an injunction and commit the party until the fine and costs are paid, or, in its discretion, may fix a definite

period of imprisonment, either with or without a fine. The court granting the injunction is necessarily invested with large discretion in enforcing obedience to its mandate, and upon proceedings for attachment for its violation the extent of the fine and imprisonment to be inflicted as a punishment for the contempt rests in the sound legal discretion of the court itself. Courts of appellate jurisdiction are exceedingly averse to interfering with the exercise of such discretion, and will not ordinarily reverse the action of the inferior courts in such matters. High on Injunctions, sec. 1458, and cases there cited.''

There is no reversible error in this record, and the judgment of the circuit court of Lake county will therefore be affirmed.

*Judgment affirmed.*