Anderson & Lind Manufacturing Company, Petitioner, v. Carpenters' District Council et al., Defendants.
William Brims, Appellant, v. The People of the State of Illinois et al., Appellees.

Gen. No. 27,151.

1. CONTEMPT—*violation of injunction against boycott.* An injunction restraining a labor union, its officers and members from either directly or indirectly threatening, coercing or intimidating any person from buying, selling or dealing in the product of a certain wood-working mill, from interfering with work on buildings using such materials and from boycotting such manufacturer and its products, is violated by officers of the union, where, with knowledge that the products of such mill are being used as trim and finishing on certain buildings, strikes are called on such buildings, and the workmen are not permitted to return to work until union-made material is substituted for that in question, and where the officers in question repeatedly declared that the reason for the strikes was the use of such mill's product on the jobs in question.

2. CONTEMPT—*issues in proceeding to punish violation of injunction against strikes and boycotts.* In a proceeding to punish officers of a labor union for contempt for violation of an injunction restraining them from threatening, intimidating or coercing customers or persons dealing with a certain nonunion mill and from boycotting such mill and the products thereof, the validity of the original injunction order, the right to enjoin a strike called to enforce a secondary boycott or the general right of strike are not at issue, and the only question for the court to determine is whether the injunction has been violated by the acts of such officers in calling strikes to enforce a secondary boycott against such mill.

3. INJUNCTIONS—*scope of injunction against strikes and boycotts.* An injunction restraining labor union officers from "attempting to prevent, by threats of injury or by threats of calling a strike against such person, any person from accepting work, or purchasing material from, or working for said complainant," a nonunion planing mill, enjoins not only the doing of acts involving threats, coercion and intimidation as ordinarily understood, and such acts as are unlawful *per se* or as are done for the primary purpose of inflicting injury upon complainant, but it also restrains the calling of strikes on construction jobs using complainant's material as a means of secondary boycott against complainant, and it is immaterial that no violence is involved.

4. INJUNCTIONS—*"threats, coercion or intimidation" as including "peaceable" strike against complainant's customers.* The calling of peaceable strikes against complainant's customers to prevent the use of materials manufactured by complainant amounts to "threats, coercion and intimidation" as the words are ordinarily understood, within the meaning of an injunction against interfering with complainant's business by such means, even though no violence was used.

5. CONTEMPT—*obligation to obey rules of labor union no defense in contempt proceeding.* The obligation of members of a labor union to obey its constitution, by-laws, rules and regulations and to refuse to work except with union-made materials does not justify the officers and members of such union in a direct violation of the terms of an injunction restraining the calling of strikes or the institution of a boycott against complainant or its products made in an open shop.

6. *Contempt—waiver of right to separate hearing on separate charges of contempt.* In a proceeding to punish violation of the terms of an injunction restraining a labor union and its officers from doing certain acts against a nonunion manufacturer, it is not error to take the evidence indiscriminately on three separate petitions charging violations at different times and against different officers of the union, where, at the time of the hearing before the master, the defendants' counsel sought a separate hearing on each petition but on agreement that the issues should be kept separate as far as possible he agreed to one hearing of testimony.

7. CONTEMPT—*proceeding to punish violation of injunction is civil contempt proceeding.* A proceeding to punish labor union officials for violation of an injunction restraining the calling of strikes on jobs using building material manufactured by a certain open shop and the institution of a boycott against such material and such manufacturer is a civil contempt proceeding wherein the defendants may be ordered to pay the complainant the costs as well as to pay a fine or in default thereof be committed to jail.

Appeal from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed November 29, 1922.

HOPE THOMPSON, for appellant.

EDMUND W. FROEHLICH, for petitioner Anderson & Lind Mfg. Co.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

By this appeal the respondent Brims seeks to reverse a judgment of the circuit court of Cook county, by which he was fined in the sum of $500, having been adjudged in contempt of court, by reason of certain· acts committed in violation of the terms of a final injunction decree, previously entered in favor of the petitioner, Anderson & Lind Manufacturing Company.

It appears from the record that the injunction decree which is the basis of the present proceedings was entered in favor of the petitioner in 1914. It restrained Thomas F. Church and the Carpenters' District Council of Chicago and all their agents or representatives from (so far as the present controversy is concerned)

"directly or indirectly threatening, coercing or intimidating any person or persons whomsoever from buying, selling or otherwise dealing in the product of the complainant;

threatening, coercing or intimidating any person or persons from buying, selling or otherwise dealing in the product of the complainant, in the furtherance of any conspiracy or boycott against complainant's business or product; * * * interfering with, hindering, obstructing or stopping, by threats, coercion or intimidation, the work on any buildings to which said complainant is furnishing material; * * *

attempting, by threats, coercion or intimidation, to prevent any person from freely contracting with * * * the complainant; * * *

organizing or maintaining a boycott against said complainant by threats, coercion or intimidation, to induce customers * * * to abstain from accepting * * * material from said complainant;

attempting to prevent, by threats of injury or by threats of calling a strike against such person, any person from * * * purchasing material from * * * said complainant;

attempting to institute, or from instituting or main-

taining, by threats, intimidation or coercion, for the purpose of preventing such persons from   *   *   * purchasing material from   *   *   * said complainant, any such strike against such person;
doing any other act or thing in the furtherance of said conspiracy, unlawfully to injure the complainant.''

Although Church and the Carpenters' District Council were both parties in the original proceedings, the respondent Brims was not. But, at the time of all the acts complained of in the present proceedings, Brims was president of the Carpenters' District Council and the record shows that he received actual notice of the injunction, together with a copy thereof, on or about October 1, 1919.

The record shows that the Anderson & Lind Manufacturing Company is a corporation, manufacturing and dealing in millwork and other building material. It has always operated its plant on an open shop basis. The United Brotherhood of Carpenters & Joiners of America was a defendant in the original proceedings brought by Anderson & Lind Manufacturing Company which culminated in the entering of the permanent injunction decree in 1914. It is a voluntary association made up of many subdivisions known as local unions, of which there are a considerable number in what is known as the Chicago District. The Carpenters' District Council of Chicago is made up of about 100 delegates, elected annually by the different local unions of the Brotherhood of Carpenters in the Chicago District. It is in the nature of a local governing body with such powers as are indicated in the constitution and by-laws of the brotherhood.

The Brotherhood of Carpenters made a number of attempts to induce the Anderson & Lind Manufacturing Company to change its policy from an open shop basis to a closed shop basis, and employ only union men, but the company declined to do so. Ultimately, the District Council and certain of its officials, as appears from the record in the original proceedings, for

an injunction, formed a conspiracy to boycott the Anderson & Lind Manufacturing Company for the purpose of so injuring its business as to compel it to unionize its factory and adopt the closed shop basis, and, in furtherance of such conspiracy, picket lines were established in the vicinity of the company's factory, and more or less physical violence was threatened or resorted to both as against the company's employees and as against the contractors who were purchasing millwork from the company, and numerous strikes were called on the jobs of such contractors, for the purpose of injuring the company's business, and not because of any controversy existing between such contractors and the carpenters. This led to the filing of the original bill and the entering of the injunction decree containing the provisions above set forth. No appeal was taken and no writ of error was sued out to reverse that decree by any of the defendants involved.

On November 8, 1919, and again on December 29, 1919, and again on August 18, 1920, complainant, Anderson & Lind Manufacturing Company, filed petitions praying for a rule against certain respondents, to show cause why they should not be punished for contempt of court, by reason of their conduct which is set forth in the various petitions and which was alleged to be in violation of the terms of the injunction decree above referred to. The first petition involved Brims and others. The second one involved Church, the District Council and others; and the third one involved Church, Brims and the District Council. These petitions were referred to a master in chancery, with directions to hear the evidence and report back to the court his findings of fact and his conclusions. After hearings duly had by the master, a report was returned to the court setting forth the facts and the conclusions of the master, to the effect that Brims, Church and the District Council had committed such acts as were in

violation of the court's decree, and recommending that they be punished for contempt of court. The court overruled exceptions duly filed to the master's report in behalf of Brims and Church, and fined each of them $500, and sustained exceptions filed to the master's report in behalf of the District Council and entered an order discharging the rule as against it. The appeal involved here is the one perfected by the respondent Brims from the order of the court, so far as it affected him.

The only question involved on this appeal has to do with the question of whether the acts committed by Brims were in violation of the original injunction decree. It appears from the evidence that one Pottinger, who had been engaged in the real estate and building business for many years, made a contract with the Anderson & Lind Manufacturing Company early in 1919 for the millwork required for a large building containing stores and apartments, which he was to erect at 4032 Irving Park boulevard in the City of Chicago. In the latter part of September of that year the respondent Church, the business agent of one of the local unions affiliated with the Brotherhood of Carpenters, with representation in the Carpenters' District Council, whose jurisdiction covered the property in question, called upon Pottinger at his office, and, not finding him in, left his card with a notation to the effect that the carpenters on the building had been stopped by him, as business agent, on order of Brims as president of the District Council, because Pottinger was using nonunion trim. According to the testimony of Pottinger, he thereupon went to see Church and talked with him about the stopping of the work on his building, and asked him why he had stopped the men and "he said because they were using Anderson & Lind material" and that they would not be permitted to go ahead; and Pottinger thereupon went to see Brims and told him that he would agree not to pur-

chase any more material from the Anderson & Lind
Manufacturing Company if he would let the work pro-
ceed, but Brims refused and said he would not let the
job go ahead until Pottinger got new material. The
work on this building was held up for a number of
weeks and finally Pottinger wrote the Anderson &
Lind Manufacturing Company a letter stating the sit-
uation and urging them to help him out of his diffi-
culty. He sent a copy of this letter to Brims, and,
according to Pottinger's testimony, Brims came to see
him the next morning, and, referring to the letter, he
accused Pottinger of trying to send him to jail. Pot-
tinger further testified that Brims thereupon asked
for the carpenter foreman and when he appeared
Brims told him to resume work on the job and go
ahead and use the material that had been objected to
and ''Do not tell anybody I stopped you.'' Pottinger
further testified that the carpenter work on this build-
ing was immediately resumed and there was no more
trouble about it, although a day or two later Church
came out to the building, and, in language far more
forceful than elegant, wanted to know who had put the
carpenters back to work, and upon being told that it
was Brims, he gave expression to a number of oaths
and ridiculed the fear of Brims about going to jail.

The record further shows that early in 1920 Pot-
tinger had a contract for the erection of another build-
ing, containing stores and apartments, at 4019 Irving
Park boulevard, and also a number of bungalows in
the same neighborhood; and he again contracted with
the Anderson & Lind Manufacturing Company for the
millwork and trim to be used on these buildings, and
the company shortly thereafter began the delivery of
this material. The carpenters employed on the bunga-
lows were engaged in setting the frames of the first
floors of those buildings early in August of that year,
when Church and Brims arrived at the buildings and
ordered them off the job, and took the numbers of the

members of the union from their cards. Pottinger, who was present, approached Brims, and, according to his testimony, he endeavored to discuss the situation with him but the latter refused to talk to him, swore at him, and advised him that he was "out of business" and "through." Pottinger is corroborated as to this incident by his business partner, Race, and also by one Jones, a hotel keeper in the neighborhood. According to the testimony of Pottinger, Church and Brims upon leaving the bungalows went over to the building which was then in the course of construction on Irving Park boulevard. He further testified that he went to see Brims a number of times after this last occurrence and that he explained to Brims, in the presence of Church, that the latter had told him, early in 1920, that he would not interfere with him and it would be all right to go ahead and buy the material which was not being objected to; that Brims thereupon took a letter out of his pocket, which Pottinger had written to him in 1919, and reminded Pottinger that by this letter he had agreed not to buy any more material from the Anderson & Lind Manufacturing Company, and Pottinger admitted writing such a letter but explained that he could not get the material elsewhere and that he had told Church of his situation and that the latter had advised him to go ahead and buy his material from the Anderson & Lind Manufacturing Company, and that he would be allowed to use it. Pottinger testified further that Church and Brims would not let him go ahead with these latter jobs nor permit him to touch the Anderson & Lind material; that Pottinger endeavored to get them to let him use so much of the material as had been stained, but they refused; that none of the individual carpenters employed by Pottinger, although members of the union, had ever shown any disposition not to work on the Anderson & Lind material until Brims had ordered them to quit, after which, they stood around for about two weeks

waiting to get back to work. Church appeared at this job nearly every morning, after the occasion last referred to, and in the meantime Pottinger had advertised for other carpenters and hired new men, and whenever Church found these carpenters at work he would immediately order them off the job, and, without exception, they left their work as soon as he ordered them to. It appears from the evidence that Pottinger managed in some way to get hold of some frames with the union label on them, Anderson & Lind Manufacturing Company apparently getting them from some manufacturer who used union labor, and, as soon as these were delivered, the men were permitted to put them in place, but apparently there were not many of these frames, for Pottinger was required to put up his buildings without frames in them, except to the extent of the frames that were procured with the union label on them. According to the testimony of Race, after Brims and Church had called the carpenters off the bungalows in August, 1920, and gone over to the building being erected on Irving Park boulevard, Brims remarked to Church that it was too bad they did not stop Pottinger on the garage he was building, and he proposed that they tie up that job but Church said it could not be done as the garage was finished. Church then asked Brims if he had not notified all the men on Pottinger's buildings to stop work, and he said that he had not but that he would, whereupon Brims went to certain glaziers who were engaged in putting glass in the front of the Irving Park boulevard job, and notified the foreman to quit as the job was "unfair"; that the glazier foreman said he could not quit unless ordered to do so by his own business agent, whereupon Brims said he would get in touch with the latter and see that the men were pulled off inside of an hour, but for some reason the developments threatened in that regard did not materialize. This witness further testified that some days after Brims and

Church had called a strike on Pottinger's bungalows and the apartment building being erected, in August, 1920, he saw Church out where these jobs were located and he asked him what was the matter and why he did not let the carpenters go back to work and Church replied that they would never go back to work on Anderson & Lind material. The record shows without question that the union carpenters had no grievance of any kind with Pottinger and made no complaint about working on Anderson & Lind material, and that they continued to do so until ordered off the job by Brims and Church, and resumed work on the job at 4032 Irving Park boulevard as soon as the officials permitted it. Many of these carpenters had been employed by Pottinger for a number of years. The record further shows that there was what was known as a steward on each job whose duty it apparently was to see that all the rules and regulations of the union were obeyed and complied with, and that this steward always complied with and followed the directions of the president of the council and the business agent of the District in which the job was located, without question, and that the carpenters recognized Brims and Church as the president of the council and the business agent, respectively, and, without exception, followed their orders as transmitted usually through the steward. That the result of a refusal to obey such orders would either be a fine or expulsion from the union is, of course, uncontroverted. Brims, in this connection, testified that when he gave his orders to carpenters and told them what the agreement of the District Council and the carpenters obligations required them to do, ''I presume they understand what the result will be if they do not follow our admonition, —they ought to.''

Brims and Church both testified that when they stopped these jobs of Pottinger's their action was prompted by reports to the effect that he was using

nonunion trim but that they did not know that it was material manufactured by the Anderson & Lind Manufacturing Company. That the contrary was, in fact, the case, is clearly established by testimony of other witnesses, in our opinion. It was established by respondents' own witnesses. One Bromley, a business agent of the District Council, testified that in May or June of 1920, the job involving the bungalows and the one involving the Irving Park boulevard apartment building then under construction were reported to the District Council by one Jensen of the Local Union No. 181, and also by the respondent Church; that "they" stated that the material being used was material being manufactured by Anderson & Lind Manufacturing Company and that he discussed this fact with Church at that time. The stenographer and bookkeeper for Pottinger testified that at the time Church left his card at Pottinger's office she asked him what the trouble was, and he said Pottinger was using Anderson & Lind material and the carpenters were not allowed to work on it.

That Brims and Church called strikes of the union carpenters employed in the construction of Pottinger's buildings at the times complained of is not denied. And, as already stated, our opinion is that the finding of the master to the effect that these respondents then knew the material manufactured by the Anderson & Lind Manufacturing Company was being used in Pottinger's buildings by the carpenters was warranted by the testimony, and his conclusion that the object of the respondents in calling the strikes in question was to penalize the Anderson & Lind Manufacturing Company or Pottinger or both, or was for the purpose of boycotting them or either of them directly or indirectly because of the failure of the Anderson & Lind Manufacturing Company to conduct a "closed" or union shop and because of Pottinger's use of its materials, is justified by the record.

We are further of the opinion that such conduct on the part of the respondents was a clear violation of the plain terms of the permanent injunction decree to which reference has been made.

In support of the appeal of the respondent Brims, counsel urges a number of propositions which are conceded by counsel for the petitioner, Anderson & Lind Manufacturing Company, and which are undoubtedly a correct statement of the law so far as they go. Labor, of course, as well as capital, has the right to organize, and labor organizations or unions may adopt and enforce among their members, constitutions, by-laws, rules and regulations and they may appoint officials or representatives to enforce them, and delegate to such officials the power to call strikes for the enforcement of their rights as against their employers. It is likewise clear that, as between the employees and their employer, the former have the right to refuse employment, or, having been employed, to strike or quit the employment (in the absence of contract) for any reason that seems to them to be sufficient, or for no reason at all. *Franklin Union v. People*, 220 Ill. 355; *Kemp v. Division No. 241*, 255 Ill. 213. In the latter case, this right to strike, on the part of union employees, was maintained even as against certain third parties who might suffer damage as a result of such a strike. In that case the third parties involved were former members of the union who had become dissatisfied with its course and had withdrawn their membership in it, though they and the members of the union continued in the employment of a common employer. On a bill filed by such third parties, seeking to restrain the union and its officials from calling a strike which was threatened unless the complainants were discharged by the employer, the court held that the defendants' right to strike might not be complained of by such third parties and if such a strike affected them to their damage, it was *damnum absque injuria.*

But these questions have nothing to do with the issues involved in the proceedings at bar. The permanent injunction which the respondent is accused of violating restrained the exercise of a secondary boycott. This, therefore, is not a strike case but is a boycott case. Sometimes acts, entirely lawful in themselves, become unlawful when exercised for an unlawful purpose. Thus the right to strike, though lawful as a right in itself, possessed by labor, becomes unlawful when used to effect a secondary boycott, that being an unlawful purpose or object. In *Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co.*, 54 Fed. 730, it appeared that the engineers of the complainant company went out on a strike on an issue involving wages, and the defendant president of the Brotherhood of Locomotive Engineers threatened to and did promulgate an order requiring the engineers of a number of railroads connecting with the complainant to refuse to deliver any cars of freight from their roads to the complainant road, or to handle or receive any cars of freight coming to their roads from the complainant road. The court restrained him from such action and required him to rescind the orders he had sent out, and he and the defendant roads and their superintendents were further restrained from, in any way, directly or indirectly, endeavoring to persuade any of the employees of the connecting defendant companies not to extend to the complainant company the same facilities for interchange of traffic as were extended by them to other companies. In that case Mr. Justice Taft, now Chief Justice of the United States Supreme Court, said:

"But it is said that it cannot be unlawful for an employee either to threaten to quit or actually to quit the service when not in violation of his contract, because a man has the inalienable right to bestow his labor where he will, and to withhold his labor as he will. Generally speaking, this is true, but not absolutely. If he uses the benefit which his labor is or will

be to another, by threatening to withhold it or agreeing to bestow it, or by actually withholding it or bestowing it, for the purpose of inducing, procuring, or compelling that other to commit an unlawful or criminal act, the withholding or bestowing of his labor for such a purpose is itself an unlawful and criminal act. * * *

"Herein is found the difference between the act of the employees of the complainant company in combining to withhold the benefit of their labor from it and the act of the employees of the defendant companies in combining to withhold their labor from them; that is, the difference between the strike and the boycott. The one combination, so far as its character is shown in the evidence, was lawful, because it was for the lawful purpose of selling the labor of those engaged in it for the highest price obtainable, and on the best terms. The probable inconvenience or loss which its employees might impose on the complainant company by withholding their labor would, under ordinary circumstances, be a legitimate means available to them for inducing a compliance with their demands. But the employees of defendant companies are not dissatisfied with the terms of their employment. So far as appears, those terms work a mutual benefit to employer and employed. What the employees threaten to do is to deprive the defendant companies of the benefit thus accruing from their labor, in order to induce, procure and compel the companies and their managing officers to consent to do a criminal and unlawful injury to the complainant. Neither law nor morals can give a man the right to labor or withhold his labor for such a purpose."

It is the respondent's contention that courts have no power to restrain a strike of workmen or the actions of the officials of the union in calling a strike, unless accompanied by acts of violence or some such course admittedly illegal, and that the court may not, under the law, enjoin such a strike even if it is occasioned by the fact that the employer against whom the strike is called is using nonunion material, and although the

effect of the strike may thus be to aid or establish a secondary boycott against the manufacturer of such material, and that, inasmuch as courts have no power to restrain such a strike, we must not presume that the court attempted so to do, in the injunction decree on which the present proceedings are based.

We are not concerned on this appeal with the question of the validity of the original decree. The respondent does not contend that the decree was void. That the court, which entered that decree, had jurisdiction of the subject-matter and of the parties is not controverted.

This is not a case where the union has adopted a policy calling for the refusal of its members to work upon material made by nonunion manufacturers, and where the union officers and representatives have put that rule into effect and the members have followed it; and where the refusal of the members of the union to work on nonunion material has been applied to all material of that class, and where, as a result, some material manufacturer who operates an open shop and whose business has suffered by reason of that rule of the union, and its enforcement, has come into a court of equity and asked that the union be enjoined from enforcing its rule and thus directly or indirectly interfering with his business.

The situation in this case shows rather that after repeated attempts had been made to induce and compel the complainant to abandon its open shop policy and to operate a closed shop, and after those efforts had not succeeded, the complainant was told by representatives of the union, in effect, that it would be put out of business unless it yielded to the demands of the union, and, following this, strikes were called on complainant's own plant, and furthermore contractors were told to discontinue doing business with the complainant, because they ran an open shop and refused to change their policy, and contractors were told that

unless they did as requested, strikes would be called on their work. On a bill then filed by the complainant, the court entered the permanent injunction decree. Still later, the acts complained of in the petitions filed by the complainant in the proceedings at bar took place, and we have only to determine, on this appeal, whether such acts were in violation of the terms of the decree.

In *O'Brien v. People ex rel. Kellogg Switchboard & Supply Co.*, 216 Ill. 354, it appeared that a labor union attempted to induce the Kellogg company to execute an agreement to run a closed shop and the company refused, and it was informed by the business agents of the unions involved that a strike would be called if the agreement was not signed. An injunction was issued and its terms were violated, as a result of which contempt proceedings were instituted. In affirming a judgment finding the respondents involved guilty of contempt of court, the Supreme Court said:

"The law is well settled that every person shall be protected in the right to enter into contracts or in refusing to do so, as he shall deem best for the advancement of his own interests, without interference by others. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any attempt to compel an individual, firm or corporation to execute an agreement to conduct his or its business through certain agencies or by a particular class of employees is not only unlawful and actionable, but is an interference with the highest civil right."

In the case cited the defendants sought to interfere with the business of another by direct means, while in the case at bar an attempt was made to employ indirect means, namely, the secondary boycott. In our opinion, the language of the Supreme Court in the *O'Brien* case, as quoted above, is entirely applicable to the situation in the case at bar.

The case of *Purington v. Hinchliff*, 219 Ill. 159, was an action on the case against a number of individuals and an organization known as the Masons' and Builders' Association. In affirming a judgment recovered by the plaintiff the court said:

"The question of unlawful conspiracy to injure the business of another, and the necessary elements to constitute it, has been before this court on other occasions. Our reports contain many well-considered cases on the subject. No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business, and any loss wilfully caused by such interference will give the party injured a right of action for all damages sustained. All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not. (*Doremus v. Hennessy*, 176 Ill. 608; *O'Brien v. People*, 216 Ill. 354.) To the same effect see *Smith v. People*, 25 Ill. 17; *Craft v. McConoughy*, 79 Ill. 346; *More v. Bennett*, 140 Ill. 69; *Foss v. Cummings*, 149 Ill. 353; *American Livestock Commission Co. v. Chicago Livestock Exchange*, 143 Ill. 210; *Harding v. American Glucose Co.*, 182 Ill. 551; *Lasher v. Littell*, 202 Ill. 551; *Chicago, W. & V. Coal Co. v. People*, 214 Ill. 421. To the same effect are the decisions of courts in other jurisdictions."

A leading case to the same effect in this State, citing a number of decisions of the courts of our State as well as decisions of the courts of other States, is the case of *Doremus v. Hennessy*, 176 Ill. 608.

The case of *Wilson v. Hey*, 232 Ill. 389, did not involve a contempt proceeding, but rather a bill seeking to enjoin certain labor unions and their officers from interfering with the complainant's business, and from taking action intended or calculated to cause the public to refrain from doing business with them. That case involved facts which constituted a boycott. It

was the defendants' position that they had done nothing unlawful and that it was not illegal for them to refuse to deal with the complainants or to notify others of such refusal, and to try to induce them, by peaceable means, not to patronize the complainants. In affirming the decree of the trial court, in awarding the complainants the injunction prayed for, the Supreme Court pointed out that the rights of labor unions in this State had been fully explained in *O'Brien v. People,* 216 Ill. 354 and *Franklin Union v. People,* 220 Ill. 355, and said:

"The right of laboring people to organize for the purpose of promoting their common welfare by lawful means is fully recognized. They may refuse to work for any particular employer, and may obtain employment for their members by solicitation and promises of support in trade and otherwise, but in the accomplishment of their purpose they must proceed only by lawful and peaceable means and they have no right to make war on other persons. It is not wrong for members of a union to cease patronizing anyone when they regard it for their interest to do so, but they have no right to compel others to break off business relations with the one from whom they have withdrawn their patronage, and to do this by unlawful means, with the motive of injuring such person. Such means as giving notices which excite the fear or reasonable apprehension of other persons that their business will be injured unless they do break off such relations or cease patronizing another are wrong and unlawful."

The case of *Barnes & Co. v. Chicago Typographical Union,* 232 Ill. 424, was likewise an original application for an injunction restraining the defendant union from interfering with the business of the complainants. The situation in that case involved a boycott, for it was shown that the union was attempting to prevent the complainants having their work done by other printing houses or by shops to whom they might apply for work, and thus preventing them from carrying on

their business except upon the condition that they should make an agreement which the union was demanding of them. The court reviewed many of the Illinois decisions on this subject and in affirming the decree of the trial court, overruling the demurrer of the defendants to the bill of complaint, the court said:

"The law allows laborers to combine for the purpose of obtaining lawful benefits for themselves, but it gives no sanction to combinations, either of employers or employed, which have for their immediate purpose the injury of another.

"The principles declared by this court in the cases referred to and stated in this opinion have the support of practically all the courts of the country. Inasmuch as this court has plainly declared the law upon the subject, it would be useless to cite the very numerous decisions to the same effect."

The case of *Mears, Slayton Lumber Co. v. District Council of Chicago*, 156 Ill. App. 327, was also an original application for an injunction. As in the case at bar, the issues involved a boycott. It was charged in the bill filed in that case that the defendants were maintaining a large force of pickets about the complainant's milling plant and that professional sluggers had been hired to intimidate its workmen, and that they had succeeded in doing so; that pickets had followed the lumber of complainant to its various destinations and that the defendants had called and, unless restrained from so doing, would continue to call strikes on buildings where such material or lumber was used, unless the lumber was rejected, and it was represented that these various acts if continued would result in the ruin of complainant's business. An injunction in the terms of the prayer of the bill was granted in the trial court. In affirming the decree the court said:

"The right to strike either singly or in combination is not involved. If it were, the right would be conceded. The situation presented is of entirely differ-

ent character. Defendants in the bill conspired to ruin complainant in its business unless it acceded to a demand that it should employ none but members of defendant unions. To enforce such demand the conspiring defendants resorted not only to the declaration of strikes, but to picketing the works and other places where complainant was transacting business, intimidating the workmen and patrons of a complainant and boycotting its products and those dealing in them. To restrain the further infliction of such acts, destructive of complainant's business and property rights, and to enable working men to engage with and work for the complainant upon terms agreeable and satisfactory to each, the injunction was issued. For openly and flagrantly violating that injunction, with knowledge of its existence, appellants were punished. Such punishment was, under the circumstances of this case, a necessity. It is the weapon with which the chancellor is armed to maintain inviolate the integrity of his injunctional order. Such power has been held to have been properly exercised in like cases, and similar orders have been uniformly maintained by courts of review whenever they have been called upon to pass their judgment upon such questions.''

Although the cases to which we have referred, which involve original applications for injunctions and were not contempt proceedings, do not present just the situation involved here, we have nevertheless quoted from them because they are cases which involved boycotts, and they indicate the attitude of the courts of this State in boycott cases.

In contending that the acts of the respondent Brims and his associates did not amount to a violation of the terms of the injunction decree, which the complainant, Anderson & Lind Manufacturing Company, had procured, counsel for the respondent has called our attention to a number of cases. We shall make no reference to most of them, as they involve the exercise of certain rights which are conceded, but which do not have to do with the issues involved here.

Our attention has been called, by counsel, to many decisions which in our opinion are not at all applicable to the case at bar. Prominent among them are *Bossert v. Dhuy*, 221 N. Y. 342, and *Parkinson Co. v. Building Trades Council*, 154 Cal. 581. Neither of these cases was a contempt case. Both were original applications for injunctions. The facts, as expressly found by the court in each of the cases, were such as did not involve a boycott. Those cases would apply to a situation where an organization was attempting to enforce its rule against nonunion made material, uniformly with respect to all manufacturers of such material, and where there was an application by such a manufacturer for an injunction, but they cannot apply to a case involving facts amounting to a boycott, and especially where the proceedings involved are proceedings in contempt by reason of conduct in violation of an existing injunction decree.

It is contended by the respondent that the injunction procured by the complainant, Anderson & Lind Manufacturing Company, showed by its terms that the court intended to restrain the doing of only such acts as involved threats, coercion or intimidation, in the ordinary meaning of those words, and such acts as were unlawful *per se,* or were done for the primary purpose of inflicting injury upon the complainant. We are unable to agree with the respondent's view of the terms used by the court in entering the permanent injunction decree. By the terms of that decree, respondent was restrained from "attempting to prevent, by threats of injury *or by threats of calling a strike against such person,* any person from accepting work, or purchasing material from or working for said complainant." As to this language, it is respondent's further contention that it must be interpreted in the light of the pleadings and evidence, in the original case, and that when so interpreted it must be concluded that in entering the decree the court did not

intend to and in fact did not restrain the calling of a peaceable strike. However, a careful examination of the record in the original case, *Anderson & Lind Mfg. Co. v. Carpenters' District Council of Chicago,* being case No. 20,809, in this court, the decision of which is reported in 199 Ill. App. 330, confirms the fact which would seem to be clear from the reading of the language in the decree itself, that the court did intend to restrain just such acts as are complained of by the petitioner in the proceedings now before us, namely, the calling of strikes against customers of the complainant, though such strikes might be called "peaceable strikes," the occasion of the strikes being the fact that the customers were using material manufactured by the complainant, the ultimate result so to be accomplished being to compel complainant to operate a closed shop. In the bill originally filed by it, the complainant set forth numerous instances of strikes called by the defendants on jobs of customers of the complainant, the circumstances of which were precisely similar to those involving the strikes called on the jobs of Pottinger, and in granting the relief afforded by its decree, the court was unquestionably seeking to give complainant the relief it prayed for, when it asked that the defendants be required to cease calling strikes for the purpose of compelling it to operate a closed shop.

But even if it were true that the injunction only restrained respondent from attempting to accomplish the desired purpose "by threats, coercion or intimidation," as respondent contends, we are of the opinion that the conduct complained of by the petitioner complainant, namely, the calling of strikes on Pottinger's buildings, would be a violation of the terms of the decree. In *Purvis v. United Brotherhood,* 214 Pa. 348, the defendants contended that their acts did not amount to coercion. The acts of the defendants complained of in that case were similar to those involved

in the case at bar.  The court held that such acts did not merely amount to persuasion, as was there urged, but to active coercion.  The court referred with approval to the opinion of the trial judge and quoted his language to the following effect:

"No violence was used nor does any seem to have been contemplated or threatened.  But acts may be coercive in character without threats or commission of violence or personal injury.  When the District Council with its seven thousand members    *    *    *    gave notice to practically all the building contractors of that district that the plaintiffs refused to run their mill in accordance with union rules, and calling attention to the working rule which forbids union workmen to work material from any nonunion mill, the contractors understood what the request not to patronize plaintiffs' mill meant.    *    *    *    In all these things the attitude of the defendants was threatening and coercive rather than persuasive."

In *Hopkins v. Oxley Stave Co.*, 83 Fed. 912, the court said:

"It may be conceded that, when the defendants entered into the combination in question, they had no present intention of resorting to actual violence for the purpose of enforcing their demands; but it is manifest that by concerted action, force of numbers, and by exciting the fears of the timid, they did intend to compel many persons to surrender their freedom of action, and submit to the dictation of others in the management of their private business affairs."

In *Barr v. Essex Trades Council*, 53 N. J. Eq. 101, the court referred to the definition of a boycott as announced by Mr. Justice Taft in *Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co.*, 54 Fed. 730, to the effect that: "A 'boycott' is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them."  The court then noted that counsel for the defendants vig-

orously urged that the boycott there complained of was not open to such adverse criticism because "there was no violence, intimidation, coercion or threats used, and everything was done in a peaceful and orderly manner." As to this contention the court said:

"It is true, there was no public disturbance, no physical injury, no direct threats of personal violence or of actual attack on or destruction of tangible property as a means of intimidation or coercion. * * * The clear weight of authority undoubtedly is that a man may be intimidated into doing, or refraining from doing, by fear of loss of business, property or reputation, as well as dread of loss of life, or injury to health or limb; and the extent of this fear need not be abject, but only such as to overcome his judgment, or induce him not to do or to do that which otherwise he would have done or have left undone."

In *O'Brien v. People*, 216 Ill. 354, the court said:

"Duress is present where a party is constrained under circumstances which deprive him of the exercise of free will to agree to or to perform the act sought to be avoided."

In *Wilson v. Hey*, 232 Ill. 389, the complainants were in the livery business and upon their refusal to employ union men only, the labor organization there involved appointed a committee to notify the business men in the town, in which the complainants did business, a part of whom had been accustomed to do business with the complainants, that they were on the "unfair list." The court observed that:

"There was no threat made by the committee in connection with the notice, but it was understood by the various parties who received it that their business would be injured and trade withdrawn unless they complied with it. * * * If the notices given or things done have the natural effect of exciting such reasonable fear and apprehension and accomplish the result intended, it is immaterial that they are not accompanied by direct threats."

Our Supreme Court has set forth the same opinion

in the case of *Barnes & Co. v. Chicago Typographical Union*, 232 Ill. 424, citing the case of *Curran v. Galen*, 152 N. Y. 33.

Under these expressions of the courts which have passed on situations similar to the one involved in the case at bar and others to which reference might be made, we are of the opinion that when the respondent called a· strike on Pottinger's buildings, because he was using Anderson & Lind material, and he was told that his work could not proceed as long as he attempted to use that material, the respondent was endeavoring to accomplish the unionizing of complainant's shop, ''by threats, coercion and intimidation'' although no physical violence was either indulged in or threatened.

A further contention of the respondent is to the effect that those who join a voluntary association thereby accept and voluntarily agree to be bound by the constitution, by-laws, rules and regulations of the association and to submit to its prescribed discipline, and that it is not coercion or intimidation nor is it unlawful for officials of a union to call upon members to comply with the provisions of the constitution, by-laws, rules and regulations of the union, or to call a strike to maintain the adopted policy of the union. Such contentions are properly conceded by the petitioner for they involve propositions, which, *per se,* are sound. But respondent may not avail himself of them to justify the violation of a valid and binding restraining order or injunction. Under the law as laid down by our Supreme Court, a court of equity has the power to enjoin a strike called in aid of a secondary boycott. A decree obtained by the petitioner in this case did so. What the decree restrained directly the respondent may not justify indirectly. Assuming that members of the carpenters' union may work for whom they please, or decline if they so desire, and that they may adopt a rule that members shall decline

to work on nonunion trim, and that the union may discipline members who violate that rule, or call a strike to carry out their policy, and that they may properly appoint or elect the respondent to represent them in administering such discipline, or calling a strike, they may not pursue such a course of action to effect a secondary boycott, in violation of an existing injunction decree. Such a course of conduct being unlawful and a violation of the terms of the injunction procured by the petitioner, it is none the less unlawful and no less in violation of the terms of the injunction, simply because it is within the terms of the constitution and by-laws which the union has seen fit to adopt. *Gatzow v. Buening,* 106 Wis. 1. Acts which are illegal and which have been forbidden by a proper restraining order may neither be legalized nor justified by the terms of the constitution, by-laws, rules or regulations of the organization restrained.

The respondent contends that it was error to proceed, as the master did, to hear testimony after the three petitions to show cause had been referred to him on all of these petitions indiscriminately, but that a hearing should have been had on each petition separately, and complaint is made of the fact that the decree of the court finding the petitioner guilty of contempt makes no distinguishing reference to the several petitions, and that it does not appear from the record on which petition the respondent was found guilty of contempt. In our opinion this contention is untenable. It appears from the record that after the three petitions involved were referred to the master, a date was fixed for the hearing of testimony and the parties duly appeared, with their counsel, and some objection was voiced by counsel for respondent to proceeding unless a hearing was had on each petition, separate from the others. Counsel explained that all he was seeking to accomplish was that each respondent should not be called upon to bear the burden of

evidence which did not apply to him, and it was suggested that that would be the case whether there was one hearing or three, and counsel for respondent, having been assured that the issues would be kept separate as far as possible, said, in effect, that it would be agreeable to him to have one hearing of testimony as to the three petitions, if it be understood that in the final analysis each petition should be regarded as separated by the evidence applicable only to that petition.

Counsel for respondent further takes exception to the form of the decree appealed from, observing that this proceeding "should properly be regarded and treated as a criminal contempt proceeding" and it is pointed out that although such is the case, respondent is ordered to pay complainant certain costs as well as to pay a fine or in default thereof, to be committed to jail. Of course this is a civil contempt proceeding, as counsel himself observed, in connection with some preliminary remarks made by him when hearings were begun before the master. We find no error in the decree, in this respect.

For the reasons we have referred to, the decree of the circuit court is affirmed.

*Affirmed.*

TAYLOR and O'CONNOR, JJ., concur.