The People of the State of Illinois, Defendant in Error, v. John E. Northup et al., Plaintiffs in Error.

Gen. No. 35,881.

WILSON, J., dissenting.

Opinion filed February 13, 1935.

JOHN E. NORTHUP, of Chicago, *pro se.*

HAROLD M. KEELE, of Chicago, *pro se.*

HENRY SEYFARTH, of Chicago, *pro se.*

GROVER C. NIEMEYER, of Chicago, for plaintiff in error James H. McQueeney.

BENJAMIN C. BACHRACH, of Chicago, for defendant in error.

MR. PRESIDING JUSTICE HEBEL delivered the opinion of the court.

This writ of error is sued out to review the record and reverse an order adjudging John E. Northup, Harold M. Keele, Henry Seyfarth and James H. McQueeney, hereinafter referred to as the respondents, guilty of criminal contempt of court and sentencing Northup, Keele and Seyfarth to pay fines of $500, $300 and $100 respectively, and McQueeney to imprisonment in the county jail for a period of 30 days, or until discharged by due process of law.

The cause is based upon a petition signed, sworn to and filed by Cameron Latter, praying for the entry of a rule against John A. Swanson and the respondents above named to show cause why they should not be punished for contempt of court. The rule to show cause was entered and discharged as to respondent Swanson on his sworn answer, and an order was entered finding the other respondents named guilty of contempt, which order is as follows:

"This cause now coming on to be heard upon the petition of Cameron Latter filed herein, and upon the sworn answers of each of the respondents, the court finds:

"1. That the case of The People of the State of Illinois vs. Timothy J. Crowe and others, No. 61153, was on the 8th day of January, 1932, and for more than a week thereafter, on trial in the Criminal Court of Cook County and undetermined.

"2. That on January 9, 1932, a petition for habeas corpus was filed in the criminal court of Cook County in case No. 61153 by John W. Latter, wherein it was alleged, among other things, that one Timothy L. Connolly was illegally restrained of his liberty and was in the custody of John A. Swanson or his assistants.

"3. That the writ of habeas corpus, in pursuance to the prayer in said petition, issued out of the Criminal Court of Cook County on the said 9th day of January, 1932, directed the said John A. Swanson and

his assistants and others, to bring the body of Timothy L. Connolly forthwith into court.

"4. That Euclid Taylor, an assistant in the office of the State's Attorney, on behalf of John A. Swanson, made return to said writ of habeas corpus as follows:

" 'That he (meaning John A. Swanson) has not the within named Timothy L. Connolly in his custody, nor has he had the said relator in his custody, nor under his restraint, nor under his directions, restraint of his liberty, and that he cannot therefore, produce the body of the said Timothy L. Connolly as commanded.'

"5. That John E. Northup, Assistant State's Attorney of Cook County, has for more than two years last past been engaged in and in charge of the prosecution of the defendants in case No. 61153, entitled, 'The People of the State of Illinois versus Timothy J. Crowe and others.'

"6. That prior to January 8, 1932, an agreement was entered into between John E. Northup and Harold M. Keele, respondents herein, both Assistant State's Attorneys of Cook County, that Keele should board the train upon which Connolly, in the custody of McQueeney, was traveling, prior to the time at which the train should reach Chicago, and that Keele should offer to McQueeney the services of an automobile to transport him and his prisoner from Joliet, Illinois, to Streator, Illinois, and that if McQueeney should accept the use of said automobile for said purpose, that Keele should request the privilege of riding in said automobile and talk with said Connolly while so riding.

"7. That Keele boarded said train in pursuance of said agreement with Northup, but he boarded said train at Chillicothe, Illinois, and rode on that train continuously until it arrived at the City of Streator in the State of Illinois. Prior to the arrival of the train at Streator, Illinois, Keele had made arrangements with the officials of the Atchison, Topeka and Santa Fe Rail-

road whereby the train was to be stopped at any point in the State of Illinois, which Keele might direct. Keele had directed two police officers of the City of Chicago, detailed out of the office of the State's Attorney's office, to be awaiting at the station at Streator, Illinois, with an automobile.

"8. That Keele carried on the conversations with McQueeney and Connolly as hereinbefore set forth.

"9. That after McQueeney—in accordance with the request of Keele—had left the train at Streator, Illinois, McQueeney, Keele and Connolly entered the automobile theretofore provided by Keele, and in company with the two officers, was driven to various towns in Illinois, Indiana, and Michigan, and that on the 13th day of January, 1932, Connolly was delivered by McQueeney to the sheriff of Cook County.

"10. That prior to the 11th day of January, 1932, Henry Seyfarth, another respondent, joined the party and that on the 10th or the 11th day of January, 1932, Keele and Seyfarth learned through the newspapers that the writ of habeas corpus, aforesaid, had issued, and that at the same time McQueeney learned of the issuance of the writ of habeas corpus.

"11. That when Keele, Seyfarth and McQueeney on January 10th or 11th, 1932, learned of the issuance of the writ of habeas corpus, it became and was the duty of McQueeney to promptly take measures to have Connolly brought to the Criminal Court of Cook County, as ordered by the writ of habeas corpus; that it became and was the duty of Keele and Seyfarth to take proper measures to cause McQueeney to at once convey Connolly to the Criminal Court of Cook County, as ordered in the writ of habeas corpus.

"12. That neither McQueeney, Keele or Seyfarth took any measures whatsoever towards promptly causing the delivery of Connolly to the Criminal Court of Cook County, as ordered in the writ of habeas corpus,

but on the contrary, Keele and Seyfarth, Assistant State's Attorneys of Cook County, having knowledge of the issuance of the writ of habeas corpus, remained with McQueeney and Connolly and conversed and talked with Connolly concerning matters in the Drainage District Case, so that Connolly was not delivered to the Sheriff of Cook County until the 13th day of January, 1932; that Keele communicated with Seyfarth and that Seyfarth, with the knowledge of Northup, brought records and documents that were used in conversations had by Keele, Seyfarth and Connolly.

"13. That on January 11, 1932, while Keele and Seyfarth were in company with Connolly and McQueeney in South Bend, Indiana, together with the police officers from the State's Attorney's office, John E. Northup, respondent herein, was in the court room presided over by court in the Criminal Court of Cook County, when the following colloquy occurred.

"Cameron Latter, the petitioner, filed the petition for the punishment of the respondents for contempt of court stated:

" 'Just one thing before it (this case) is dismissed. I might suggest that Mr. Northup enlighten us whether he knows where Mr. Keele is and whether he can reach him, and if he can, he should produce him.'

"Whereupon Mr. Northup said:

" 'I don't have to do anything of the kind.'

"Whereupon the following colloquy took place:

" 'The Court: Well—

" 'Mr. Northup: I don't have to go out and ascertain and find out where he is now.

" 'The Court: Well, do I understand—

" 'Mr. Northup: There is no power on earth that can compel me, in court or out of court.

" 'The Court: Let me ask you a question, Mr. Northup, you can answer it or not, as you wish. Do you know where Mr. Keele is?

" 'Mr. Northup: I do not. I tell you the absolute truth.

" 'The Court: Well, I assume you are telling the truth. Do you expect him in your office today?

" 'Mr. Northup: I doubt it.

" 'The Court: If he gets in touch with you or you get in touch with him, will you ask him to come in here tomorrow morning?

" 'Mr. Northup: I will not. He doesn't belong here. He shouldn't be here.'

"14.   That when Keele had successfully caused Mc-Queeney to depart from the Santa Fe train and enter into the automobile provided by the State's Attorney's office, at Streator, Illinois, and when Keele had successfully caused McQueeney to travel by automobile through three different states and through cities of those states, as hereinabove set forth, McQueeney had surrendered the actual custody and restraint of Connolly to Keele, and through Keele to John E. Northup, and that when on January 10th, or 11th, 1932, Keele, Seyfarth and McQueeney learned of the issuance of the writ of habeas corpus, the statement of John E. Northup in the court room presided over by this court, on the 11th day of January, 1932, as above set forth, conclusively proves a ratification and consent by Northup of the acts of Keele, Seyfarth and McQueeney in keeping Connolly from being delivered to the Sheriff of Cook County or to the Criminal Court of Cook County as ordered in the writ of habeas corpus.

"15.   That the conduct of Keele, Seyfarth, and Mc-Queeney in this respect, was the conduct in pursuance of an agreement between McQueeney, Keele and Seyfarth and Northup, and constituted a flagrant contempt of this court.

"The court, therefore, finds, that John E. Northup, Harold M. Keele, Henry Seyfarth and James H. Mc-Queeney are guilty of contempt of court in the doing

of the acts found by this court to have been done by them in the premises.''

The court then imposed the penalties upon the respondents, from which they are prosecuting this writ of error.

The court, in making the findings that appear in the court's order, considered each of the respondent's answers, all of which were under oath and substantially as follows:

''The answer of respondent Northup admits the pendency on January 9, 1932, of the Crowe case and that Connolly had not appeared for the trial but had been for three years a fugitive from justice, during all which time the Cook County State's Attorney and the Federal government had been seeking to apprehend him and if possible to secure his testimony upon the trial, and stated that Connolly's absence was pursuant to a conspiracy by Connolly and unknown persons to obstruct justice. The answer admits that John W. Latter filed a petition for a writ of habeas corpus for the production of Connolly and states that Connolly had not authorized John W. Latter to sign the petition and that the filing thereof was an overt act in pursuance of a conspiracy between Cameron Latter, John W. Latter and other persons to obstruct justice. The answer admits that the petition for habeas corpus was presented to Judge Sullivan and that Judge Sullivan ordered that a habeas corpus writ issue, returnable forthwith as prayed. The answer states that Northup had no personal knowledge whether the habeas corpus writ was served upon State's Attorney Swanson or not and whether Assistant State's Attorney Taylor made return to the writ to the effect that the State's Attorney did not have Connolly in his custody and could not therefore produce him. The answer admitted that Northup was an Assistant State's Attorney and for more than two years then last past had been in charge

of the prosecution of the defendants in the Crowe case; that he was assisted therein by Keele and Seyfarth; that prior to January 8, 1932, he learned that through the efforts of the Citizens Association Connolly, one of the defendants, was apprehended in California; that he took measures to cause Connolly's extradition from California to Illinois; that he had taken part in the designation of McQueeney, as Governor's agent, to receive Connolly from the California authorities and bring him back to Cook County, Illinois; that he knew McQueeney had received Connolly into his custody and control as such agent and was traveling upon a Santa Fe train from California to Chicago.

"Northup admitted in his answer that prior to January 8, 1932, he conferred with Keele and arranged with him that Keele should board the train on which Connolly was traveling with McQueeney prior to its arrival at Chicago and should offer to McQueeney the services of an automobile to bring him and his prisoner from Joliet, Illinois, to Chicago, and that if McQueeney should accept the use of said automobile for said purpose then Keele should ask the privilege of riding therein and of talking with Connolly while so riding.

"Northup further stated in his answer that he had no personal knowledge of Keele boarding the train nor of any arrangements made by Keele with the officers of the Santa Fe Railroad and that Northup had no personal knowledge of Keele's suggesting, inducing and procuring McQueeney to leave the train and place Connolly in the State's Attorney's automobile; and that he had no knowledge whether thereafter under the suggestion, procurement and direction of Keele, Connolly in the company of McQueeney and two police officers, in a State's Attorney's car, was driven to various places.

"Northup further stated that he had no personal knowledge of an article in the Chicago Sunday Tribune

on January 10, 1932, stating that a habeas corpus writ had been issued by Judge Sullivan and stated that he had no personal knowledge whether on January 11, 1932, Keele, Seyfarth, McQueeney and Connolly, with two police officers, were in South Bend, Indiana.

"The answer admits that the colloquies recited in the petition took place in the court room of Judge Sullivan on January 11, 1932, substantially as therein stated.

"Northup, further answering, stated that he did not agree with Swanson, Keele, McQueeney or Seyfarth, or all or any two or more of them that the service of said writ of habeas corpus when issued should be evaded in the form that petitioner states it was evaded and denies that what was done by Keele, Seyfarth, the police officers, McQueeney or by any two or more of them in and about the driving of Connolly in an automobile from place to place after his detrainment from the Santa Fe train was done in pursuance of an agreement between Swanson, Keele and Northup to the effect that Keele should do all the things that he did do and Northup denies that any such agreement ever existed.

"Northup, further answering, stated that the acts and things done by Keele and Seyfarth were not the acts and things of Swanson and Northup, nor were they done by reason of any agreement with them.

"Northup, further answering, stated that the acts and things done by Keele and Seyfarth were not the acts and things of Swanson and Northup, nor were they done by reason of any agreement with them. Northup further stated in his answer that he did not, with intent to avoid the effect of the writ of habeas corpus issued on January 9, 1932, transfer and place Connolly in the custody of a person other than McQueeney, nor did he conceal Connolly and change his place of confinement with intent to avoid the operation of the writ of habeas corpus issued January 9, 1932.

"The answer of respondent Swanson is substantially similar to that of Northup.

"The answer of respondent Keele admits the pendency of the Crowe case, the absence of Connolly as a fugitive from justice and the efforts made to apprehend him; that John W. Latter signed and filed on January 9, 1932, a petition for a writ of habeas corpus in which it was falsely alleged that Connolly was held in the custody of State's Attorney Swanson and his assistants.

"Keele admits that the petition contained a prayer for a writ of habeas corpus for the production of Connolly and that on January 9, 1932, Judge Philip L. Sullivan ordered that a writ issue as prayed.

"Keele states that he knows that on January 9, 1932, Connolly was not in the custody or under the control of State's Attorney John A. Swanson or any Assistant State's Attorney or other employee of said State's Attorney but that on said date Connolly was not in the State of Illinois and was on said day in the custody and under the control of James H. McQueeney, the duly authorized and acting messenger of the Governor of Illinois, and stated that Connolly never has been in the custody or under the control of State's Attorney John A. Swanson or any of his assistants or employees.

"Keele admitted in his answer that prior to January 8, 1932, a conference was held by Northup with him in which it was arranged that Keele should board the train on which Connolly was traveling in McQueeney's custody prior to its arrival at Chicago and should offer to McQueeney the services of an automobile to transport him and his prisoner from Joliet to Chicago and that if McQueeney should accept the use of said automobile Keele should request the privilege of riding therein and of talking with Connolly while so riding.

"Keele admits that he boarded the train at Chillicothe and rode thereon until it arrived at Streator and that he had made arrangements with the railroad officials for the stopping of the train at any point in Illinois which he might direct and that he had directed two police officers of the State's Attorney office to be waiting with an automobile at Streator, but denied that they were waiting for the purpose of conveying Connolly in said automobile to such places as Keele should direct, but states the fact to be that said officers were waiting with said automobile to drive McQueeney and his prisoner to the Sheriff of Cook County if this seemed proper to said McQueeney.

"Keele, in his answer, denies that on January 8, 1932, he, together with McQueeney, suggested, induced and procured McQueeney to leave said train with Connolly and denies that he suggested, induced and procured McQueeney to place Connolly in said automobile and stated the fact to be that he advised McQueeney of the presence of said automobile in Streator and that if McQueeney deemed it advisable to leave the train and enter said automobile with his prisoner for conveyance to Chicago said automobile was available for said purpose.

"Keele denied that he individually, or acting for Northup, Swanson, Seyfarth or any or all of them or any two or more of them, by suggestion, procurement or direction, for the purpose of evading any writ of habeas corpus that might issue from any court for Connolly during most of the 8th, 9th, 10th, 11th and 12th days of January, 1932, or any one or more of said days, or any part of said days, cause Connolly, in company with McQueeney and two police officers of the State's Attorney's office, to be driven to various cities and towns in Illinois, Indiana and Michigan, but stated that said driving to said towns was by direction of McQueeney and at the request of Connolly.

"Keele denied that said driving was with the intent or for the purpose of evading any writ of habeas corpus that might issue from any court of the United States or the State of Illinois and stated that the possibility of the issuance of such a writ by any court never occurred to his mind and no thought in respect to the issuance of any such writ was ever entertained by him until January 11, 1932, at which time he first learned through a newspaper that such a writ had been issued and that the State's Attorney of Cook County had made a return thereto that he did not have Connolly in his custody, which return Keele knew to be true, for he knew that Connolly at all times between January 8th and January 11, 1932, had been and then was in the custody and control of McQueeney, agent and messenger of the Governor of Illinois and had not been and was not in the custody of any other person or persons and that delivery of Connolly to the Cook County Sheriff had been delayed by McQueeney at the request and pursuant to the entreaties of Connolly and at the request of no other person or persons and that said delivery had been delayed for no other reason.

"Keele admitted that he took no steps on January 11, 1932, to promptly bring Connolly to the Criminal Court of Cook County in response to said writ of habeas corpus for the reason that he, Keele, did not have Connolly in his custody or under his control and it would have been useless for him to have attempted to do that which he had no right to do.

"Keele further stated that on Monday, January 11, 1932, he, Seyfarth, McQueeney and Connolly were in South Bend, Indiana. Keele stated that he had no knowledge whether the colloquies between Judge Sullivan and other persons in his court room set out in the petition took place for the reason that he was not present and that the first he ever heard of those matters was after his return to Chicago on January 13, 1932.

"Keele admits that the petitioner, Cameron Latter, heard his testimony before Judge Sullivan and denies that during the week preceding January 8, 1932, he, Swanson, Northup, Keele, Seyfarth and McQueeney anticipated and expected that a writ of habeas corpus would issue out of the Criminal Court of Cook County for said Connolly and stated that he had no such anticipation and that the petitioner's allegation in this respect is knowingly perjured and false.

"Keele denied that anything was done by him, by Seyfarth, by McQueeney, or by any one or by any two or more of them in and about the driving of Connolly in an automobile from place to place in pursuance of an agreement between Swanson, Northup, Seyfarth and Keele that Keele should do all the things he did do and denies that any such agreement ever existed. Keele states that the allegation of the petition in this regard is knowingly false and perjured.

"Keele denied that any agreement was ever made between him and any other person or persons whatever for the purpose of securing the control of Connolly to conceal him and change the place of his confinement with intent to avoid the operation of the writ of habeas corpus issued on January 9, 1932, and denies that he committed any act or acts or did anything to secure the control of Connolly, to conceal him and to change the place of his confinement with intent to avoid the operation of the writ of habeas corpus issued on January 9, 1932, and denied that he at any time or at any place secured or had control of Connolly and stated that never at any time or place did he conceal him and change the place of his confinement with intent to avoid the operation of any writ of habeas corpus.

"Keele denied that he was guilty of contempt of court and denied that with intent to avoid the writ of habeas corpus issued on January 9, 1932, he trans-

ferred and placed Connolly in the custody of a person other than McQueeney and denied that he concealed Connolly and denied that he changed the place of confinement of Connolly with intent to avoid the operation of said writ of habeas corpus and stated that the allegations of the petition were knowingly falsely made and perjured.

"Seyfarth, in his sworn answer under oath, admits the allegations of the petition in respect to the pendency of the Crowe case, the absence of Connolly and the filing of the petition for habeas corpus on January 9, 1932, for the production of Connolly.

"Seyfarth stated that he had no personal knowledge of any conference between Northup and Keele with reference to the transportation of Connolly and had no personal knowledge whether Keele boarded the train.

"Seyfarth admitted that he was in South Bend, Indiana, together with two police officers, McQueeney the Governor's agent, and Timothy L. Connolly on January 11, 1932, and that he then read in the Chicago Sunday Tribune of January 10, 1932, that Judge Sullivan had issued a habeas corpus writ for the production of Connolly and that respondent took no steps to bring Connolly to the Criminal Court in response to the writ for the reason that he did not have the custody or control of Connolly.

"Seyfarth states that he has had no knowledge of the statements of Latter, Northup, Judge Sullivan and Swanson in court set out in the petition.

"Seyfarth stated in his answer that he did not anticipate and expect that a writ of habeas corpus would issue out of said Criminal Court of Cook County and that he did not, during the week preceding January 8, 1932, or at any other time, agree with Swanson, Northup, Keele, McQueeney, and neither did respondent or any or all or any two or more of them agree

together, that the service of said writ of habeas corpus should be evaded.

"Seyfarth further states that what was done by Keele, himself and by McQueeney was not done in pursuance of an agreement between Swanson, Northup and Keele and denies that any such agreement ever existed.

"Seyfarth further stated that his acts were not the acts of Swanson and Northup and were not done by reason of any agreement with them.

"Seyfarth stated that he did not, with intent to avoid the effect of the writ of habeas corpus issued on January 9, 1932, transfer and place Connolly in the custody of a person other than James H. McQueeney nor did he conceal Connolly and change his place of confinement with intent to avoid the operation of the writ of habeas corpus issued January 9, 1932.

"The sworn answer of James H. McQueeney states under oath that McQueeney admits the pendency on January 9, 1932, of the Crowe case and that shortly before that date Connolly, who had been a fugitive, had been apprehended in California.

"McQueeney stated that he had been in California continuously for more than a month prior to January 9, 1932, and upon the apprehension of Connolly, McQueeney was by warrant duly and legally issued, authorized and empowered by the Governor of Illinois as messenger and agent of the State of Illinois to take and receive from the California authorities said Timothy L. Connolly, a fugitive from justice and convey him to Illinois, there to be dealt with according to law; that as such messenger and agent, of said State, McQueeney took and received from the California authorities said Connolly and on January 5, 1932, left California upon a Santa Fe train with Connolly in his custody and under his control and restraint as such messenger and agent en route to Chicago.

"McQueeney stated in his answer that on the morning of January 8, 1932, respondent, Keele, requested him as messenger and agent, having the custody and control of Connolly as aforesaid, to leave the train at Streator with Connolly in his custody; and that pursuant to said request McQueeney, with Connolly in his custody and control, left the train at Streator and with Keele started for Chicago in an automobile supplied by Keele; that in order to complete the talks between Keele and Connolly and with the consent of Connolly, respondent with Connolly in his custody and under his control and restraint, said Keele and others went to various cities in Illinois, Indiana and Michigan and arrived at Chicago on January 13, 1932, at which time he delivered Connolly to the sheriff of Cook County.

"McQueeney stated that on January 14, 1932, he learned that on January 9, 1932, a petition for a writ of habeas corpus to bring the body of Connolly before the court was filed in the Criminal Court of Cook County, alleging that Connolly was illegally held in the custody of John A. Swanson State's Attorney, and unnamed assistants; that a writ of habeas corpus was issued on said petition and return thereto made on behalf of Swanson to the effect that Swanson did not then have and had not had Connolly in his custody and therefore could not produce him.

"McQueeney stated in his answer that at all times from and after taking and receiving Connolly from the authorities of California to and at the time of delivering him to the sheriff of Cook County, Connolly was in the sole custody, and under the sole control, restraint and direction of McQueeney as messenger and agent of the State of Illinois and not as an assistant, employee, agent or representative of John A. Swanson, State's Attorney of Cook County, John E. Northup, Harold M. Keele, Henry Seyfarth, or any or either of them.

"McQueeney stated in his answer that Keele was not on the train on the morning of January 8, 1932, pursuant to any plan, undertaking or agreement with McQueeney or at his suggestion or direction and that Connolly was not taken from the train at Streator and to said towns in Illinois, Indiana and Michigan and his delivery to the sheriff of Cook County delayed until January 13, 1932, for the purpose of evading any writ of habeas corpus that might issue from the Cook County Criminal Court or any other court for said Connolly, or for the purpose of securing the control of Connolly, placing him in the custody of any person other than respondent and/or concealing him and/or changing the place of his confinement with intent to avoid the operation of said writ of habeas corpus issued on January 9, 1932.

"McQueeney stated that he had no agreement or understanding whatsoever with Swanson, Northup, Keele or Seyfarth or any or either of them or with any other person to evade the service of any writ of habeas corpus for Connolly in any manner whatsoever.

"McQueeney further stated in his answer, that he was appointed messenger and agent of the State of Illinois by the Governor thereof, pursuant to the United States statutes and not by virtue or under authority of any writ of process issued out of or by any officer of the Criminal Court of Cook County, Illinois and that he is not and was not amenable or accountable to said Criminal Court for any act or conduct by him as such messenger and agent and that the said Criminal Court of Cook County is without power or jurisdiction to punish him or adjudge him to be in contempt thereof by reason of any of the matters and things alleged in the petition filed.

"McQueeney denied in his answer that he was guilty of contempt of court and denied that Connolly was transferred and/or placed in the custody of any person

other than McQueeney and denies that with intent to avoid the operation of the writ of habeas corpus issued on January 9, 1932, Connolly was concealed or his place of confinement changed.''

We have set forth in substance each of the respondents' answers, which are under oath, for the reason that the facts appearing in the several answers are necessary in the consideration of the questions involved.

The trial court, in reaching the conclusion and findings contained in the order under discussion, considered the several answers, as evidenced by the finding that the conduct of Keele, Seyfarth and McQueeney was in pursuance of an agreement between McQueeney, Keele, Seyfarth and Northup, and constituted a flagrant contempt of court. The order also finds that the statement of Northup, made in the court room on January 11, 1932, conclusively proves ratification by Northup and consent to the acts of Keele, Seyfarth and McQueeney in keeping Connolly from being delivered to the sheriff of Cook county.

Upon this finding by the answer of Northup, one of the respondents, he denies that he agreed with Swanson, Keele, McQueeney or Seyfarth that the service of the writ of habeas corpus should be evaded; that what was done after Connolly left the train and was driven from place to place, was not done by Keele and Seyfarth, and that the acts of Keele and Seyfarth were not the acts of Swanson and Northup, nor were they done by reason of an agreement between them.

Likewise Keele in his sworn answer states that he never agreed with Swanson, Northup, Seyfarth and McQueeney to move Connolly from place to place to evade the habeas corpus writ, and that the acts were not pursuant to an agreement with any of the other respondents. The answers of Seyfarth and McQueeney, which are set forth in the opinion, are to a like effect.

The respondents contend that the answer of the respondents categorically deny under oath the contemptuous act charged against them; that the trial judge was bound to take the answers as true and to discharge the rule as to each respondent; that it effectively appears from the written order of the trial judge that he considered matters *de hors* the answers in arriving at his conclusion that the respondents were guilty of contempt, and that therefore the judgment should be reversed; and furthermore that the court erred in considering all the answers together in passing upon the question of the guilt or the innocence of each respondent and imposing the penalties set forth in the order. The rule of procedure to be followed, as stated by the Supreme Court of this State in the case of *People v. McLaughlin,* 334 Ill. 354, is as follows:

"The distinction between criminal and civil contempts has been recognized in this jurisdiction since the decision in *Crook v. People,* 16 Ill. 534, and has been declared in numerous decisions since. When the contempt consists of something done or omitted in the presence of the court tending to impede or interrupt its proceedings or lessen its dignity, or out of its presence in disregard or abuse of its process, the proceeding is punitive or criminal, and the penalty is inflicted by way of punishment for the wrongful act and to vindicate the authority and dignity of the people as represented by their judicial tribunals. In such cases the defendant is tried upon his answer, alone. No other evidence may be heard. If the party charged shows by his answer under oath that he is not guilty of the contempt charged his answer is conclusive. If the answer is false the remedy is by indictment for perjury. The answer must be taken as true, and if sufficient to purge the party of the contempt he is entitled to be discharged. (*O'Brien v. People,* 216 Ill. 354; *Hake v. People,* 230 id. 174; *Rothschild & Co. v. Steger Piano*

*Co.,* 256 id. 196; *People v. Seymour,* 272 id. 295; *People v. McDonald,* 314 id. 548.)''

This procedure has been approved by a long line of authorities in this State which have followed the rule in equity proceedings and courts of law, announced in Blackstone's Commentaries in these words:

''Thereafter (referring to courts of equity) after the party in contempt has answered the interrogatories, such his answer may be contradicted and disproved by affidavits of the adverse party. Whereas, in the courts of law, the admission of the party to purge himself by oath is more favorable to his liberty, though perhaps not less dangerous to his conscience; for, if he clears himself by his answer, the complaint is totally dismissed.''

This court in the case of *Welch v. People,* 30 Ill. App. 399, in an opinion by Justice Gary, in which Justice Garnett and Justice Moran wrote separate concurring opinions, held that where the respondent in a common law proceeding, in answer to a rule to show cause why he should not be attached for contempt, denies the entire charge by affidavit, he is entitled to his discharge. It is improper to hear oral evidence to contradict such affidavit.

This rule has also been followed, in addition to the cases announced as authority for the rule in *People v. McLaughlin,* 334 Ill. 354, in *Oster v. People,* 192 Ill. 473; *People v. Grogan,* 178 Ill. App. 314; and *Perry v. Kausz,* 167 Ill. App. 250. It not being proper to hear oral evidence to contradict respondent's answer, the rule would clearly apply in the consideration of facts other than the facts in each of the respondent's sworn answers in this case, in order to determine the guilt of such respondent. The reason for the rule, as we gather from the opinions of the court, is if the answer of the respondent denies the various allegations charged against him in a contempt proceeding, he is purged

of any contempt and is entitled to be discharged in a common law proceeding. The case, therefore, is ended so far as the question of contempt is concerned. On the other hand, if the respondent by his sworn answer has committed perjury and he is indicted for the offense, when the case is tried at the request of the respondent, the facts must be submitted to a jury of his peers.

It is evident that the trial court disregarded the answer of each of the respondents in determining whether the respondent by his answer purged himself of contempt, but the court considered respondents' answers collectively in determining the guilty, and in so doing disregarded the rule that the answers are to be taken as true. This was error.

The rule that we have been considering and which limits the court to the sworn answer filed by the respondent in the determination of whether or not the respondent is guilty of contempt, is the rule of procedure approved by the Supreme Court of this State, and is to be applied by this Court, even though we may doubt the wisdom of the rule that a court may not entertain evidence in addition to the evidence offered by the defendant in determining the guilt or innocence of a defendant in a contempt proceeding. Mr. Justice Moran, in a special concurring opinion, in the case of *Welch v. People,* 30 Ill. App. 399, then being considered by the Appellate Court, was inclined to criticise the rule, although obliged to apply it, as it was the established law. However, he said in his opinion:

"While the rule of practice is as stated, and while the courts are undoubtedly bound by it as a rule of procedure, it is a rule of common law practice which, in my opinion, does not in our day and generation tend to the promotion of public justice. . . .

"Contempt proceedings against jury-fixers under the common law rule by which the courts are now bound,

are idle. A man who will bribe a juror, will, as a rule, purge his contempt by denying the fact in an affidavit, and take his chances in a trial for perjury in the Criminal Court, and will generally go unwhipped of justice. The courts can only declare the law as they find it, and follow it as it is. The Legislature alone can make new laws or change existing methods of trial and rules of procedure, and to the Legislature, those who would make contempt proceedings for jury-bribing effective, must look for a change of the common law rule.''

The suggestion made by Justice Moran applies with equal force to the conditions as they now exist, and if the rule is to be changed, it must be changed by the legislature, which can enact laws to change existing methods of trial and rules of procedure.

From what we have above stated, we are of the opinion that the court erred, and the order will be reversed.

*Order reversed.*

HALL, J., concurs.

WILSON, J., dissents.

### DISSENTING OPINION.

WILSON, J.: I am unable to concur with the majority opinion in this case. It does not appear to me that Northup by his answer has purged himself of contempt. He admits by his answer that he conferred with Keele and arranged to have Keele board the train on which Connolly was traveling with McQueeney prior to its arrival at Chicago; that he, Keele, should offer to McQueeney the services of an automobile to convey them from Joliet, Illinois to Chicago and that Keele should ask for the privilege of riding therein, so that it is apparent that the defendant Northup had discussed plans by which Connolly was to be spirited from the train and brought to Chicago in a manner which would forestall the purpose of a writ of habeas corpus exactly as was accomplished in the case at bar. More-

over, the defendant Northup in his answer stated that he had no personal knowledge of Keele boarding the train or inducing or procuring McQueeney to leave it with his prisoner, nor of the fact that the State's officer, together with Keele, was driven in a State's attorney's car to the various places charged, before bringing Connolly to Chicago. He does not deny, however, that he had knowledge, but insists in his answer that it was not personal. If by personal knowledge is meant actually seeing and observing, then Northup did not have personal knowledge. But, in my opinion, if he knew of the arrangements which were being carried out, even though indirectly, and failed to assist the court in attempting to bring about the presence of Connolly before the court, he was guilty of contempt.

Under his answer, in my opinion, evidence was admissible which would bear on the question as to whether or not his conduct was such as to interfere with and obstruct the due administration of the law. Courts have so surrounded the contemnor with its protection that the dignity of the court has suffered. While the rule appears to be that the defendant in this class of cases should be dismissed upon his sworn answer and by his answer subjects himself to the charge of perjury, nevertheless, I am unable to recall any instance wherein such perjury proceedings have been instituted.

The contempt being one involving the processes of the court and the due administration of the law, the court is the only one, usually, who has a particular interest, and the court's interest generally ceases when it finds that by reason of a sworn answer it is rendered helpless in upholding the dignity of the judicial procedure.